**In re John WOODS, Debtor.**

**ITT FINANCIAL SERVICES, Plaintiff,**

**v.**

**John WOODS, Defendant.**

**Bankruptcy No. 85–01097K.**
**Adv. No. 85–0614K.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Nov. 13, 1986.

---

Larry S. Eisman, Simon Jeffrey Rosen, Philadelphia, Pa., for plaintiff.

Michael A. Cibik, John F. Gehring, Philadelphia, Pa., for debtor.

William Schaps, Philadelphia, Pa., Trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

This adversarial proceeding presents a challenge to the dischargeability of the Debtor's obligation to the Plaintiff loan company in a Chapter 7 bankruptcy case, pursuant to 11 U.S.C. §§ 523(a)(2)(A), 523(a)(2)(B), and 523(a)(2)(C). Because we find that the transaction was a closed-end consumer loan, we conclude that the transaction in issue was neither a debt for "luxury goods or services" nor an extension "under an open-end credit plan." and hence was not within the scope of § 523(a)(2)(C). We further hold that the Plaintiff has not established the fraud necessary to bring the transaction within §§ 523(a)(2)(A) or 523(a)(2)(B) under the requisite "clear and convincing" evidentiary standard. Therefore, we shall dismiss the Plaintiff's Complaint and retain jurisdiction to allow the Debtor to seek costs and a reasonable attorney's fee pursuant to 11 U.S.C. § 523(d).

### A. FINDINGS OF FACT

1. The Debtor in this bankruptcy case and the Defendant in this adversarial proceeding is John Woods, a 36–year–old man residing in a home owned by him situated at 1825 South 20th Street, Philadelphia, PA 19145.

2. In February, 1985, the Debtor received an unsolicited mailing from the

Plaintiff, ITT FINANCIAL SERVICES,[1] inviting him to borrow money from it.

3. As explained in testimony by Donald Bilger, manager at that time of the Plaintiff's branch office at 9808 Bustleton Avenue, Philadelphia, PA, where the loan was made, and still a manager at an office of the Plaintiff in Fairless Hills, Pa., the mailing sent to the Plaintiff was directed to a group of potential customers pre-selected through credit reports. Receipt of this mailing guaranteed the Debtor that he would receive a loan of up to $2,000.00 as long as he could verify employment with an income of at least $12,000.00 annually.[2]

4. On March 7, 1985, the Debtor went to the Plaintiff's Bustleton Avenue office to take advantage of the loan offer.

5. The agents of the Plaintiff who attended the Plaintiff's application were Lisa Haberman, then a management trainee with the Plaintiff, but presently employed as a paralegal in a large Philadelphia law firm, Drinker, Biddle, and Reath, and another agent of the Plaintiff, whose name on the application appears to be "William H. Bender."[3]

6. A credit application form was filled out mostly by Mr. Bender, who did not testify at trial, and partially by Ms. Haberman and the Debtor himself.

7. The Credit Application lists the employer of the Debtor as "Local 332, 1310 Wallace St., Philadelphia, PA 19123."[4]

8. Ms. Haberman testified that the Debtor verified his income by presenting her with two (2) pay stubs from the City of Philadelphia, documenting gross income of $642.00 per bi-weekly pay period. These pay stubs, admitted into evidence over the Debtor's objection, bear no name or any other element which would link them with the Debtor.

9. The Debtor testified that he had advised the Plaintiff's agent that he had worked on a fairly regular basis on jobs referred to him by the union recited on the Application, for the past thirteen (13) years, but that, at the time of making the Application, he was working for Victor Oil Burner Service. He further testified that he had not worked for the City of Philadelphia since 1969, that the pay stubs were not his, and that he did not give them or any other pay stubs to Ms. Haberman or any other agent of the Plaintiff.

10. The version of facts presented by the Debtor is more likely to be accurate than that presented by Ms. Haberman, and is therefore credited by this Court. The Debtor's version is supported by the Plaintiff's own Application form. Despite her alleged "unfamiliarity" with Philadelphia at the time, the Court concludes that Ms. Haberman should have and would have recognized the discrepancy between the employer named in the Application and the pay stubs if it had existed.

11. Unknown to the Debtor, and not divulged to him by the Plaintiff's agents, was a portion of the Credit Application form designated as "Upsell Proposals," wherein Mr. Bender noted that the Plaintiff would be willing to lend the Debtor a maximum of $12,500.00 with his home as security, with payment terms of $265.00 monthly for one hundred and twenty (120) months.

1. The documents identify the Plaintiff as "ITT Consumer Discount Co.". The Plaintiff, however, identified itself as "ITT Financial Services" in the Complaint. We are unable to resolve this discrepancy on the record before us.

2. The Court inquired of Mr. Bilger whether he considered the Plaintiff to be bound to make a loan as long as the Debtor's employment was so verified even if he informed the Plaintiff's agents that he planned to file bankruptcy the following day. Mr. Bilger, rather surprisingly, answered in the affirmative. This exchange indicated that any statements by the Debtor were irrelevant to the extension of credit, except such as would have tended to indicate that he earned more than $12,000.00 annually if he did not in fact earn this sum. No proof of such a misrepresentation on the part of the Debtor was proven.

3. This name might be "William H. Benden," as the signature of this individual is less than totally legible.

4. The correct identity of this union is Local 332 of the Laborers District Council of the Metropolitan Philadelphia Area and Vicinity.

12. Mr. Bilger explained that the Plaintiff did not yet offer any sort of revolving credit plan, as he further indicated that some competing loan companies did offer and the Plaintiff was contemplating offering in the future.

13. Consistent with its guarantee, the Plaintiff loaned the Defendant a total sum of $2,301.08, payable in monthly installments of $92.00 monthly for three (3) years, without checking his employment or credit history any further.

14. The loan documents received by the Debtor, entered into evidence, provide the disclosures appropriate in a closed-end consumer loan to the Debtor.

15. The Debtor testified, without rebuttal, that he used the loan proceeds to pay several outstanding bills to lending institutions and "people he owed in the street," which the Court credits.

16. The Debtor also stated that "his word was his bond," and that he had every intention of paying off this loan when he made it on March 7, 1985. Although less than totally convinced on this point, the Court can point to no "clear and convincing" evidence to the contrary and hence accepts this as true.

17. The Debtor testified that, within a week of incurring this debt, he lost his job at Victor Oil Burner and suffered an injury to his back. Again, due to the lack of any contradictory "clear and convincing" evidence, this testimony is accepted by the Court.

18. The Debtor testified that, after these misfortunes, he was referred to "bankruptcy lawyers," Michael A. Cibik Associates, his present Counsel, by a friend; consulted this office for the first time on about March 15, 1985; and filed his Chapter 7 bankruptcy Petition on March 25, 1985. While the Court again is skeptical about this sequence, it notes no evidence to the contrary, and therefore accepts same as true.

## B. CONCLUSIONS OF LAW

1. The transaction of March 7, 1985, was not a debt incurred for "luxury goods or services," within the scope of 11 U.S.C. § 523(a)(2)(C).

2. The transaction of March 7, 1985, was also not an "extension of consumer credit under an open end credit plan," within the scope of 11 U.S.C. § 523(a)(2)(C).

3. The Debtor did not utilize any false "statement in writing" to obtain the loan in issue, and hence the debt to the Plaintiff cannot be deemed non-dischargeable under 11 U.S.C. § 523(a)(2)(B).

4. The Plaintiff has not produced the requisite "clear and convincing" evidence that the Debtor obtained credit by false pretenses, within the scope of 11 U.S.C. § 523(a)(2)(A).

5. The Debtor's obligation to the Plaintiff is dischargeable.

## C. DISCUSSION

The Plaintiff's Complaint is based on all of the three (3) alternative grounds for exceptions to discharge set forth in 11 U.S.C. § 523, which provides as follows:

§ 523 Exceptions to discharge.

(a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt— . . .

(2) for money, property, services, or an extension, renewal or, refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive; or

(C) for purposes of subparagraph (A) of this paragraph, consumer debts owed

to a single creditor and aggregating more than $500 for "luxury goods or services" incurred by an individual debtor on or within forty days before the order for relief under this title, or cash advances aggregating more than $1,000 that are extensions of consumer credit under an open end credit plan obtained by an individual debtor on or within twenty days before the order for relief under this title, are presumed to be nondischargeable; "luxury goods or services" do not include services reasonably acquired for the support or maintenance of the debtor or a dependent of the debtor; an extension of consumer credit under an open end credit plan is to be defined for purposes of this subparagraph as it is defined in the Consumer Credit Protection Act (15 U.S.C. 1601 *et seq.*);

As the Court aptly points out in *In re Smith,* 54 B.R. 299, 301 (Bankr.S.D.Iowa 1985):

Under subparagraphs (A) and (B) of subsection 523(a)(2) the creditor has the burden of proving all the elements of fraud by clear and convincing proof. *See In re Bonefas,* 41 B.R. 74, 78 (Bkrtcy.N.D. Iowa 1984). Those elements are hard to prove under a preponderance of the evidence standard, and even harder to prove under a "clear and convincing" standard. Under subparagraph (C), a creditor can avoid the heavy burden of proving fraud.

■ This statement of the stiff burden for a plaintiff to prevail under 11 U.S.C. § 523(a)(2)(A) or (B) is undoubtedly accurate, and has been uniformly accepted in decisions of this Court. Judge King of this Court has held that, in order for the Plaintiff to prevail under these provisions, it must prove that "(1) the debtor made a materially false representation; (2) with the intent to deceive; (3) that the creditor relied on that false representation; and (4) that the creditor sustained proximate damage as a result." *In re Gelfand,* 47 B.R. 876, 879 (Bankr.E.D.Pa.1985) (citations omitted). Chief Judge Goldhaber has stated: "A necessary element under

§ 523(a)(2)(A) is *actual* fraud rather than merely fraud implied in law. 3 COLLIER ON BANKRUPTCY ¶ 523.08 [4] (15th ed. 1985)" *In re Emery,* 52 B.R. 68, 70 (Bankr. E.D.Pa.1985). Also of note is *In re Walthall,* 38 B.R. 140 (Bankr.D.Md.1984), where the same principles are asserted in another case involving this same loan company in a loan guarantee situation similar to that here. We believe that, when the issue turns on intent to deceive, fraud must be shown by clear and convincing evidence, a higher standard than mere preponderance of evidence. *See Brown v. Buchanan,* 419 F.Supp. 199, 201–02 (E.D.Va.1975); and the *Matter of Ackerman,* 16 B.R. 640, 644 (Bankr.D.N.J.1981).

■ The Plaintiff's case under 11 U.S.C. § 523(a)(2)(B) is based solely upon its assertion that the Defendant deceived it by presenting phony City of Philadelphia pay stubs to Ms. Haberman. As we indicate at Finding of Fact 10 *supra,* p. 986, we do not believe that the Defendant presented these pay stubs to Ms. Haberman. Such an attempt, when he had accurately divulged his regular employer as Local 332, would be inconsistent and too transparent. If the Debtor were really trying to deceive the Plaintiff into believing that he worked for the City, he obviously would have also told the Plaintiff's agent that he worked for the City. The Debtor completed a year and a half of college; he would have had to have been an utter fool, which he was not, to have relied upon Ms. Haberman's not checking on the discrepancy between his reported place of employment and his pay stubs.

We do not consider this finding, as the Plaintiff suggests, a determination that Ms. Haberman (or the Plaintiff) is lying. Rather, we believe that it is very likely that Ms. Haberman or some other employee of the Plaintiff unintentionally placed someone else's pay stubs in the Debtor's file and that, having seen many customers during her employment, Ms. Haberman's recollection that the Debtor gave her the pay stubs is simply inaccurate.

The most troublesome hurdle for the Debtor to overcome is 11 U.S.C.

§ 523(a)(2)(A), despite the strict burden that attaches to the Plaintiff to meet its burden of proving its elements. We find it remarkably coincidental that, within the period of two (2) weeks, the Debtor was solicited for a loan, made the loan, lost his job, hurt his back, decided that he could no longer abide by his credo that "his word is his bond," discovered his bankruptcy counsel, and shortly thereafter was on his way with a Chapter 7 proceeding. However, truth can be stranger than fiction, and we cannot say that the Plaintiff has produced the requisite "clear and convincing" evidence of the Debtor's promulgating falsehoods in any respect and hence of fraud. We make this finding in light of the fact that we can find no other indicia of the Debtor's lack of truthfulness generally, or, as the Plaintiff would have us believe, on the issue of the pay stubs, and we therefore have no cause to doubt his credibility. Certainly, the "circumstantial" evidence of fraud here is considerably less than that in the cases cited by the Plaintiff, *e.g.*, *In re Frye*, 48 B.R. 422, 425–27 (Bankr.M.D.Ala. 1985) (court points to twelve (12) separate questionable aspects of Debtor's story); *In re Fox*, 13 B.R. 827, 830 (Bankr.W.D.Ky. 1981) (court refuses to accept Debtor's claim of lack of knowledge of husband's fraud when husband discussed the elements of the fraud with his mother while all three (3) were riding together in the car trip to the loan office); and *In re Milbank*, 1 B.R. 150 (Bankr.S.D.N.Y.1979) (Husband made loans from his wife and father-in-law to rehabilitate a business while he was having a love affair with his next-door neighbor's wife, which the Court deemed indicative of an intention to abandon the wife and the business).

The only remaining issue—and it is a rather simple, purely legal issue—is whether the Plaintiff can fit this transaction within those limited circumstances set forth in 11 U.S.C. § 523(a)(2)(C), wherein the heavy burden otherwise placed upon a creditor asserting non-dischargeability pursuant to 11 U.S.C. § 523(a)(2) is altered.

Our starting point again is *Smith, supra*, where the court holds that "statutes relating to discharge are to be liberally construed in favor of the debtor and strictly construed against the creditor," 54 B.R. at 302, and that "it is obvious from the wording of subparagraph (C) that the provision only applies to a narrow set of circumstances." *Id.* at 303.

■ We believe, with the *Smith* court, that the "luxury goods and services" portion of § 523(a)(2)(C) is inapplicable because "[u]nder the scheme of the section cash is not considered a good." *Id.* at 302 n. 1. While the *Smith* court offers no explanation for this conclusion, we believe that it is appropriate, because it is evident that the two (2) types of credit set forth in 11 U.S.C. § 523(a)(2)(C) are meant to be mutually exclusive, i.e., the first category refers solely to goods and services other than cash, and the second category concerns cash only. Otherwise, the second category would be superfluous, as every cash advance of greater than $1,000.00 incurred with twenty (20) days of filing would also constitute "luxury goods or services" incurred within forty (40) days of filing. In addition, we are not certain whether cash itself, in any amount, can be considered a "luxury." Like shelter, clothing, food, and water, money, at least in some quantity, is a necessity to survive in our society. We are certainly not prepared to say that making a loan of about $2,300.00, as did the Debtor here, constitutes a splurge, no matter to what use the money was put. Here, moreover, the Debtor testified that he did not use the cash to purchase luxury goods or services, which might present a close case, and there is absolutely no evidence to the contrary. He testified that he used it to pay bills, all or most of which would have been discharged in his bankruptcy anyway. He therefore apparently got nothing of real value to him from the loan proceeds. He merely "substituted" the Plaintiff for his other creditors.[5]

---

**5.** These pre-petition payments may, of course, have constituted preferential transfers. *See* 11 U.S.C. § 547(b). However, this fact does not

■ We also hold, contrary to the Plaintiff's vigorous yet vacuous arguments, that the loan in question was not "under an open end credit plan" and hence not within the second category of credit extensions set forth in 11 U.S.C. § 523(a)(2)(C). As § 523(a)(2)(C) itself provides, our reference point for the definition of this term is the federal Consumer Credit Protection Act or Truth-in-Lending Act (TILA) definition, set forth in 15 U.S.C. § 1602(i) as follows:

(i) The term "open end credit plan" means a plan under which the creditor reasonably contemplates repeated transactions, which prescribes the terms of such transactions, and which provides for a finance charge which may be computed from time to time on the outstanding unpaid balance. A credit plan which is an open end credit plan within the meaning of the preceding sentence is an open end credit plan even if credit information is verified from time to time.

This definition is further refined in the applicable Regulation, 12 C.F.R. § 226.-2(a)(20), as follows:

(20) "Open-end credit" means consumer credit extended by a creditor under a plan in which—

(i) The creditor reasonably contemplates repeated transactions;

(ii) The creditor may impose a finance charge from time to time on an outstanding unpaid balance; and

(iii) The amount of credit that may be extended to the consumer during the term of the plan (up to any limit set by the creditor) is generally made available to the extent that any outstanding balance is repaid.

An even more extensive discussion of the term "open end credit plan" is included in the Official Staff Commentary on Regulation Z, published by the Board of Governors of the Federal Reserve Board, to which we are required to accord great deference. *See Ford Motor Credit Corp. v. Milhollin,* 444 U.S. 555, 565–70, 100 S.Ct. 790, 796–99, 63 L.Ed.2d 22 (1980). The beginning point of the Commentary is the impact upon the relevant issue of dischargeability of the Debtor's loan from the Plaintiff.

statement that "[o]pen-end credit is consumer credit that is extended under a plan and meets *all three* (3) criteria set forth in the definition." Comment upon ¶ 2(a)(20), at ¶ 1. The term "plan" is also addressed in the Commentary, and it is stated therein that the term "connotes a contractual arrangement between the creditor and the consumer." *Id.* at ¶ 2. The Commentary further points to three (3) other characteristics of open-end credit: (1) Repeated transactions, by which "the creditor must legitimately expect that there will be repeat business rather than a one-time credit extension." *Id.* at ¶ 3; (2) a finance charge computed on an outstanding balance, which "means that there is no specific amount financed for the plan from which a finance charge, total of payments, and payment schedule can be calculated." *Id.* at ¶ 4; and (3) a "reusable line" of credit must be established, by which it is meant that "[t]he total amount of credit ... is generally replenished as earlier advances are repaid," which the Commentary further states "distinguishes open-end credit from a series of advances made pursuant to a closed-end credit loan arrangement." *Id.* at ¶ 5.

Case law interpreting the term "open end credit plan" is sparse, but there are two (2) cases which the court deems relevant. In *Goldman v. First National Bank of Chicago,* 532 F.2d 10, 17 n. 11 (7th Cir.1976), the court states as follows:

An open end credit plan is one in which credit terms are initially established with the opening of the account, but no fixed amount of debt is incurred at that time. Purchases made from time to time are added to the outstanding balance in the account and each new purchase represents an additional extension of credit under the terms as originally defined in the credit agreement....

In *Maes v. Motivation for Tomorrow, Inc.,* 356 F.Supp. 47, 50 (N.D.Cal.1973), the court emphasizes the "repetitive" nature of a "true" open-end credit plan.

Given all of the foregoing, it is patently clear that the loan transaction of March 7, 1985, between the parties was *not* the establishment of an "open end credit plan." Beginning with the Act definition, we cannot say that *any* of the requisite three (3) criteria are met. The fact that the Plaintiff's agent filled out certain figures in the "Upsell Proposals" portion of the Plaintiff's Credit Application does not seem to us sufficient to establish that the Plaintiff "reasonably contemplated repeated transactions." The finance charge was imposed *one* time on the loan proceeds given to the Debtor on March 7, 1985, rather than charged "from time to time on an outstanding balance." There is no indication anywhere in the loan contract that credit extended was to be "generally made available to the extent that any outstanding balance is repaid."

Assuredly, there is no evidence of the existence of the characteristics of an "open end credit plan" referred to in the Official Staff Commentary. The mere existence of the Upsell Proposals does not constitute a "plan." This portion of the Application appears to be simply the Plaintiff's internal notation of its tentative limitations upon credit to the Debtor. It might be characterized as a gleam in the eye of the Plaintiff's agent as to the maximum amount of business which the Plaintiff might do with the Debtor. But it is no more. Certainly, no arrangement with the Debtor to lend him any sums other than the amount advanced on March 7, 1985, was established, or even, apparently, discussed.

Similarly, there was no apparent contemplation of repeated transactions by both parties, particularly the Debtor. As in the Commentary examples, this was *not* the granting of a "line of credit," which, as the Plaintiff's agent revealed, in an unguarded moment, *is* contemplated in a revolving loan agreement which some loan companies, but not the Plaintiff, offer.

Also telling is the absence of the computation of the finance charge on a changing outstanding balance. In this regard, we note that the TILA disclosures provided to the Debtor by the Plaintiff comport with those required by 15 U.S.C. § 1638 and 12 C.F.R. §§ 226.17, 226.18, for "closed-end credit," rather than with those required by 15 U.S.C. § 1637 and 12 C.F.R. §§ 226.5 to 226.9 in "open-end credit" transactions. No dispatch of "periodic statements" to the Debtor, as would occur in an open-end credit transaction, was proven. Further, there is no indication that the Debtor had a "reusable line" of credit, whereby he could replenish his available credit after he made payments. Finally, contrary to the *Goldman* definition that the existence of same is inconsistent with an "open end credit plan," there *was* a "fixed amount of debt ... incurred" on March 7, 1985.

We therefore have no hesitancy in concluding that the transaction in issue was not "under an open end credit plan" as contemplated by the TILA and hence by 11 U.S.C. § 523(a)(2)(C). The Plaintiff's arguments to the contrary, in light of the weight of considerations to the contrary, can only be characterized as patently frivolous.

The Court, therefore, has no hesitancy in rendering judgment for the Debtor on the Plaintiff's claim.

The only issue remaining in this proceeding is whether the Debtor is entitled to costs and reasonable attorney's fees under 11 U.S.C. § 523(d). Given the patent frivolity of the Plaintiff's principal argument that the Debtor should be held liable on the basis of § 523(a)(2)(C), we cannot find that the position of the Plaintiff in this matter was substantially justified. We do request that, barring an appeal, the parties confer to attempt to resolve this issue, although, in the event that they are unable to do so, we shall retain jurisdiction of this matter to consider any Motion for costs and attorney's fees which might be filed hereafter by the Debtor's counsel, in conformity with the prerequisites set forth in *In re Meade Land and Development Co., Inc.*, 527 F.2d 280 (3d Cir.1975).