In re Myrtle FITZGERALD, Debtor.

UNITED STATES of America, Plaintiff,

v.

Myrtle FITZGERALD and Leo Doyle, Trustee, Defendants.

Bankruptcy No. 86–01472S.

Adv. No. 86–0908S.

United States Bankruptcy Court, E.D. Pennsylvania.

May 27, 1987.

Henry J. Sommer, Philadelphia, Pa., for debtor/defendant.

Virginia Powel, Asst. U.S. Atty., Philadelphia, Pa., for U.S.

Leo F. Doyle, Philadelphia, Pa., trustee/defendant.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION AND PROCEDURAL HISTORY

In this proceeding, we are called upon to determine whether the Government has made out a case that the receipt of an overpayment of Social Security widow's benefits by the Debtor could be declared nondischargeable, as a debt incurred by false pretenses, a false representation, or fraud, per 11 U.S.C. § 523(a)(2)(A). We find that the Government has fallen short of meeting its burden of proving the elements necessary to succeed in such a Complaint by the requisite "clear and convincing evidence" standard, and we shall therefore grant the Debtor's Motion to Dismiss, per Bankruptcy Rule (hereafter referred to as "B.R.") 7041 and Federal Rule of Civil Procedure (hereinafter referred to as "F.R. Civ.P.") 41(b).

The Debtor, a 71–year-old widow, filed a Petition in bankruptcy under Chapter 7 of Title 11, United States Code, on March 28, 1986. On August 4, 1986, the United States of America (referred to herein as "the Government") filed this adversarial proceeding challenging the dischargeability of the Debtor's liability of $6,886.30 to the Social Security Administration (hereinafter referred to as "SSA") under 11 U.S.C. § 523(a)(2)(A) of the Bankruptcy Code.[1]

---

1. The Government also invokes, in the Complaint, "11 U.S.C. § 523(a)(2)(G)" and 11 U.S.C. § 523(a)(6). There is no such provision as the former section. We fail entirely to see how receipt of an overpayment of governmental benefits could conceivably be characterized as a willful and malicious injury by the Debtor to the Government per § 523(a)(6). We note that the Government, in its two rather substantial Briefs, does not address this section of the Code, and

The Debtor answered, demanding an award of costs and attorney's fees pursuant to 11 U.S.C. § 523(d). A pre-trial Deposition of the Debtor was taken by the Government on January 14, 1987. The matter was listed for trial on January 29, 1987, and all parties were present and prepared to proceed.

Unfortunately, in only one of two such instances in our nine-month tenure on the bench, we were unable to reach all of our assigned cases on that day, and failed to reach this case. As a result, we entered a Pre-Trial Order on February 3, 1987, requesting the parties to exchange witnesses, pre-mark exhibits, prepare a Stipulation of Facts, and prepare pre-trial briefs on or before February 13, 1987, and rescheduling the trial for February 18, 1987.

Both counsel performed their duties admirably, especially given the short time-frame. A Joint Pre-Trial Order and Stipulation, as well as Briefs, were timely filed on February 13, 1987. Unfortunately, the Debtor was hospitalized as of February 18, 1987, and we were compelled to again continue the matter until March 18, 1987.

On the latter date, the Debtor's counsel reported that the Debtor remained hospitalized. The Government, having a witness present in the court room, desired to proceed. The parties therefore agreed that testimony of the witness, Evelyn Higman, a program analyst specializing in overpayment cases at SSA's Mid-Atlantic Program Service Center, would be adduced; the Debtor's Deposition would be admitted *in toto* into the record; the Court would consider the matter on the Debtor's B.R. 7041 and F.R.Civ.P. 41(b) Motion; and a subsequent hearing would be scheduled in the event that this Motion were denied. On March 19, 1987, we issued an Order allowing the Debtor and the Government an opportunity to submit Supplemental Briefs on or before April 17, 1987, and May 1, 1987, respectively, and scheduling the further hearing, if needed, on May 28, 1987, stating that, if the Debtor were phys-

ically incapable of attendance, her defense must be presented per B.R. 7032 and F.R. Civ.P. 32(a)(3)(C).

The May 28, 1987, hearing was continued by agreement until June 3, 1987. However, we are issuing this Opinion and Order granting the Debtor's F.R.Civ.P. 41(b) Motion prior to that date, and we believe that any further proceedings would constitute a waste of the resources of all involved. Pursuant to F.R.Civ.P. 41(b), we are herein presenting the requisite Findings of Fact, Conclusions of Law, and Discussion in support of our Order. *See In re Woerner,* 66 B.R. 964, 971 & nn. 7–8 (Bankr.E.D.Pa. 1986), *aff'd,* C.A. No. 86–7324 (E.D.Pa., Order dated April 28, 1987); and *In re Schiliro,* 64 B.R. 422, 424 (Bankr.E.D.Pa.1986).

## B. FINDINGS OF FACT

1. The Debtor, MYRTLE FITZGERALD, was born January 2, 1916, went to school only through the ninth grade, and has now been twice widowed.

2. From 1933 until his death in 1963, the Debtor was married to one Thomas Fitzgerald. The couple have five surviving adult children.

3. In February, 1968, the Debtor applied and was determined eligible to receive widow's benefits on the account of Mr. Fitzgerald. A widow(er) is eligible for such benefits at age sixty unless (s)he is disabled, in which case (s)he is eligible at age fifty. The Debtor, being only fifty-two years old at the time, was therefore found to have been disabled.

4. The "standard procedure" in SSA offices was, in 1968, and continues to be, per Ms. Higman, to discuss the rules and responsibilities concerning receipt of such benefits with beneficiaries, give them a booklet which explains same, and periodically dispatch and require remittance of reporting forms from them.

5. Ms. Higman has never had any direct contact with the Debtor, and the Government neither produced, nor offered any

therefore we assume that, in the exercise of good judgment, this ground has been abandoned.

explanation for the failure to produce, any SSA employees who had direct contact with the Debtor. Therefore, she could present no proof that the "standard procedure" was followed here.

6. The Debtor suffered a stroke in December, 1985. Her memory has been impaired as a result, and she had no recollection of the circumstances of her applications for benefits.

7. The booklets in issue and the reporting forms included statements that remarriage terminates eligibility for widow(er)'s benefits.

8. Although the Debtor admitted receipt of the booklets, there is no evidence that any explanations were given to her by SSA employees at any time. There is similarly no indication nor any affirmative evidence that the Debtor fully understood this requirement and how it applied to her.

9. In January, 1970, the Debtor remarried, to one Woodrow Hutchins. The Debtor only resided with Mr. Hutchins for "a couple of months" and thereafter separated and resumed the use of the surname of her first husband, as she continues to do to date.

10. The Debtor testified at her Deposition that she went into her local SSA office prior to her marriage, advised a certain agent there of her pending marriage, and was informed only that she should contact the office again after she was married. Further, she testified thereat that she was not warned that remarriage would terminate her benefits.

11. The Debtor also testified that she telephoned the local SSA office after her remarriage and advised a certain agent in the office of this, although it is not clear what response she received.

12. The only rebuttal to the Debtor's testimony, per Findings of Fact 10 and 11 *supra,* was Ms. Higman's testimony that such communications would ordinarily have been noted in the Debtor's records, and that there were no such notations. Therefore, there is no direct evidence which contradicts the Debtor's Deposition testimony on these points.

13. It appears that, unknown to the Debtor, Mr. Hutchins applied for SSA retirement benefits on his own account in 1976, and received same until his death in 1978.

14. Shortly after his death, a check for Mr. Hutchins was forwarded to the Debtor, as his widow, from the nursing home where he had been living. The Debtor stated, at her Deposition, that this was her first notice of his death, and she took the check to the SSA office and returned it. No action was taken by the SSA office at this time except to take the check back.

15. In January, 1979, the Debtor applied for widow's benefits on the account of Mr. Hutchins. It was only upon review of this application and the Debtor's statement thereon that she was receiving benefits on Mr. Fitzgerald's account that the fact that she was receiving such benefits in violation of pertinent SSA Regulations came to light.

16. It is not clear whether the Debtor would have been receiving more under the account of Mr. Hutchins than she had under the account of Mr. Fitzgerald at all pertinent times from 1976 to 1979, although it is clear that, had SSA received and acted properly upon advice that the Debtor had married Mr. Hutchins in 1970, she would have been ineligible for any benefits on Mr. Fitzgerald's account between 1970 and at least 1976, when Mr. Hutchins first applied for benefits.

17. SSA determined that the Debtor had been overpaid $11,304.60 on Mr. Fitzgerald's account, apparently at a rate of between $100.00 and $135.00 monthly for nine years.

18. At the time that the Debtor filed her bankruptcy petition on March 28, 1986, the Government had reduced the over-payment balance to $6,886.30 by offsetting retroactive benefits to which she was otherwise due on Mr. Hutchins' account, and recouping $49.00 from her benefits monthly for several years.

19. The Government ceased the monthly recoupments in 1985, due to the Debtor's filing a request that such recoupment be waived. Ms. Higman testified that a pre-

liminary decision denying the waiver had been made, but had not been issued, which she attributed to her belief that the bankruptcy filing stayed the official issuance of this decision.

CONCLUSIONS OF LAW

1. A debt may be deemed nondischargeable under 11 U.S.C. § 523(a)(2)(A) if and only if the creditor proves each and every one of the five requisite elements[2] by "clear and convincing evidence."

2. The Government has failed to produce any evidence from which we could find or reasonably infer that the Debtor knew that she was making "false representations," or that she made such representations "with the intention and purpose of deceiving" the Government, which are two of the requisite elements.

3. The Government has shown no right to relief, and therefore judgment must be entered in favor of the Debtor on her B.R. 7041 and F.R.Civ.P. 41(b) Motion.

DISCUSSION

The pertinent section of the Bankruptcy Code, 11 U.S.C. § 523(a)(2)(A), provides as follows:

Sec. 523. Exceptions to discharge.

(a) A discharge under Section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—

.   .   .   .   .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

.   .   .   .   .

Because "[e]xceptions to discharge are narrowly construed against the creditor, and in favor of the debtor," *In re Gelfand*, 47 B.R. 876, 879 (Bankr.E.D.Pa.1985) (per KING, J.), *see also, e.g., In re Decker*, 595 F.2d 185, 187 (3d Cir.1979); and *Woerner, supra*, 66 B.R. at 971, the burden of proof is squarely upon the Government to prove

" 'all of the elements of fraud by clear and convincing evidence.' " *In re Woods*, 66 B.R. 984, 988 (Bankr.E.D.Pa.1986) (quoting *In re Smith*, 54 B.R. 299, 301 (Bankr.S.D. Iowa 1985)), in order to prevail in a proceeding challenging dischargeability of a debt under § 523(a)(2)(A). *Accord, e.g.: In re Phillips*, 804 F.2d 930, 932 (6th Cir. 1986); and *In re Hunter*, 780 F.2d 1577, 1579 (11th Cir.1986).

The Government concedes that it is well-established, in opinions written by both the present and the past Chief Judges of this Court, that there are five "elements" which the Government must prove, which are as follows:

(1) that the debtor made the representations;

(2) that at the time he knew they were false;

(3) that he made them with the intention and purpose of deceiving the creditor;

(4) that the creditor relied on such representations; and

(5) that the creditor sustained the alleged loss and damage as the proximate result of the representations having been made.

*In re Hammill*, 61 B.R. 555, 556 (Bankr.E. D.Pa.1986) (per TWARDOWSKI, J.); and *In re Taylor*, 49 B.R. 849, 851 (Bankr.E.D. Pa.1985) (per GOLDHABER, CH. J.).

The fifth element is made out. Arguably, the Government made out the first and the fourth elements, at least sufficiently to overcome a 41(b) Motion. We note that, *if we were able to credit fully the Debtor's Deposition testimony, there would be a strong argument that these two elements are lacking.* The Debtor claimed that she informed her local SSA office that she was planning to marry. Further, she stated that, after she remarried, she called and informed the office of this. Since there was no response indicating that this rendered her ineligible for benefits, she assumed that she remained eligible. If this were so, then the Debtor would be exonerated from even the charge that she had

**2.** See page 926.

made misrepresentations to the SSA. Further, if there were no misrepresentations, we could hardly find reliance *on* misrepresentations by the Government. The overpayment would have simply been due to SSA's own administrative error. No less authority than our local Court of Appeals has stated that the SSA is not only, like any large and human institution, subject to error, but particularly prone to error. *See Wier v. Heckler,* 734 F.2d 955, 956–58 (3d Cir.1984). However, given our reluctance to make any credibility determination without the live Debtor before us, and our recognition that the Debtor's stroke has dimmed her memory and renders her reliability suspect, we are not prepared to rest our decision on the absence of these two elements.

However, we find no evidence which is either "clear" or "convincing," let alone the requisite "clear *and* convincing" evidence, that the Debtor knowingly made a false representation and did so with the intention and purpose of deceiving the SSA, findings we would be required to make to hold that the third and fourth elements of the test set forth in *Hammill* and *Taylor* have been met.

The Government asks us to make an inference that the Debtor received a thorough explanation of all of her responsibilities as a recipient of widow(er)'s benefits and understood completely the SSA's booklets and forms such that she could not reasonably doubt that any remarriage, even one so impermanent as her brief union with Mr. Hutchins, disqualified her from eligibility to receive widow's benefits. Thus, the Government argues, we can infer that the Debtor knew that her remarriage ended her eligibility and she failed to so inform the Government to willfully deceive it.

We cannot and will not make such inferences. The Social Security Act and the rules for eligibility for benefits thereunder is a subject which rivals the Internal Revenue Code in its complexities. In *Russell v. Heckler,* 814 F.2d 148, 154–55 (3d Cir.1987), the Court of Appeals refuses to attribute knowledge of SSA Regulations to a recipient in determining whether an individual is "not without fault" such that a waiver of recoupment of an overpayment of benefits is appropriate. Similarly, numerous cases have established that a recipient cannot be deemed "at fault" just because (s)he acted contrary to Regulations explained in materials received from the office, *Lewin v. Schweiker,* 654 F.2d 631, 636 (9th Cir.1981); and *Kendrick v. Califano,* 460 F.Supp. 561, 569–72 (E.D.Va.1978), or that circumstances exist which the court, with 20–20 hindsight, could conclude should have alerted a recipient to his or her potential ineligibility. *Romero v. Harris,* 675 F.2d 1100 (10th Cir.1982); (claimant received income which he placed in a bank account which at one point exceeded $4,400.00); *Lewin, supra* (claimant obtained and used four times her proper benefit amount); *Meyer v. Secretary of HEW,* 513 F.Supp. 41 (W.D.Mich. 1980) (claimant received unemployment compensation benefits simultaneously with SSA benefits); *Henson v. Harris,* 503 F.Supp. 1 (S.D.N.Y.1980) (claimant simultaneously received veteran's benefits and had signed a form stating receipt of no income other than SSI; *Davidson v. Harris,* 502 F.Supp. 1208 (E.D.Pa.1980) (two streams of social security benefits received); and *Yulling v. Califano,* 474 F.Supp. 601 (S.D.N.Y.1979) (claimant "compulsively" saved over $3,000.00 from his benefits in a savings account in excess of resource limit). The Government had at its disposal the ability to call its employees who actually dealt with the Debtor in order to undermine her credibility on any point on which she testified regarding her direct contacts with the SSA. Its failure to do so obviously does not permit it to make inferences in its favor.

Moreover, the standard for review of an SSA determination that a recipient was "not without fault" in receiving benefits to which he or she was not entitled is merely that there is "substantial evidence" to support the administrative decision. *See, e.g., Russell, supra,* 814 F.2d at 149. It is almost 180 degrees removed from the strict standard of proving the elements of its case by "clear and convincing" evidence which would have to be met for the

Government to succeed in the instant determination under § 523(a)(2)(A).

The Government asks that we infer the requisite "intent to deceive" from an examination of its records showing no reported contacts such as those of which the Debtor testified at her deposition and that receipt of her checks and the circumstances of the manner in which this matter came to light support such a conclusion. To the contrary, we find nothing in these circumstances which support the conclusion of an intention to deceive.[3] The matter came to light only because of the Debtor's actions in applying for widow's benefits and her disclosure, on that application, that she was already receiving benefits under Mr. Fitzgerald's account. The Government's unlikely hypothesis that the Debtor was attempting to simultaneously obtain benefits under both accounts is belied by her divulgence of receipt of benefits under Mr. Fitzgerald's account. A party seeking to deceive the SSA in the manner suggested surely would have withheld this information. Also, it appears that the Debtor may have been able to maximize her benefits by applying for benefits on Mr. Hutchins' account earlier. Her failure to do so is indicative of ignorance of her rights, not a fraudulent intent to deceive the Government.

The Government's argument is that, because the "usual practice" of a government agency is to record certain information, the absence of such information in its record is of strong evidentiary value. The Debtor, we think aptly, quotes thusly from the recent decision of the Court of Appeals in *Armstead v. United States Dep't of HUD*, 815 F.2d 278, 282–83 (3d Cir.1987), in response, indicating the small measure of force of this argument:

Plaintiff does say under oath that she talked to a woman who answered the phone at the HUD office. The agency fails to controvert this statement, and relies instead on its "usual practice" to log telephone calls from mortgagors. Because the plaintiff's file contains no notation, HUD says plaintiff did not call.

Based on the record before us, HUD failed to canvass the female employees in the office to determine if any of them had spoken to plaintiff. Nor did defendant inform us how many female employees work in the Philadelphia office or the number who have access to the telephones.

The weakness of HUD's defense is glaring. We need not cite authority to support our conviction that the "usual practice" is not always followed in offices, private or governmental, large or small. The people at work there are not automatons; they are human beings, not immune from lapses in procedure because of distractions, overwork, forgetfulness, carelessness, or other foibles to which we are all vulnerable.

That something should have been done does not prove that it was done, but that is precisely the fallacy on which HUD relies to deny plaintiff a hearing. Resting a decision on such an unsupportable ground is a classic example of arbitrary and capricious conduct ... (footnotes omitted).

The testimony of Mr. Higman is entirely evidence of SSA's "usual practice" of recordation of information, from which SSA seeks to have us infer, as a matter of law, that such information was not provided because it is not in the record. We reiterate two earlier observations: (1) Such evidence was found incapable of satisfying the Government's much lesser standard of proof, i.e., that the action of its agency was not "arbitrary and capricious," in *Arm-*

---

3. Clearly distinguishable on this point are the other "public benefits" cases cited by the parties. In *In re Reinstein*, 32 B.R. 885 (Bankr.E.D.N.Y. 1983), the Debtor-husband and Debtor-wife each admittedly used a half dozen or so aliases to obtain multiple unemployment compensation benefits. In *In re Forcier*, 7 B.R. 31 (Bankr.D. Ariz.1980), the Debtor repeatedly signed statements that he was not attending school, and thus was entitled to unemployment compensation benefits, when he *was* attending school full-time. Finally, *In re Kaliff*, 2 B.R. 465 (Bankr.D.Ariz.1979), is a case decided under the Bankruptcy Act in which the Debtor received unemployment compensation benefits while receiving striker's benefits after being expressly told by his union's business agent that he could not legally do so.

*stead.* At 279. Here, proof must be provided in accordance with the very stringent "clear and convincing evidence" standard; and (2) The SSA most probably had, at its disposal, the agents who talked with the Debtor herself, and worked in the offices she claimed to consult, but chose to call only Ms. Higman. This observation is mirrored by the above quotation from *Armstead.* Again, if any inference can be drawn from this failure to call such agents, it would hardly be favorable to the Government.

Therefore, we believe that it would be wasteful to the time and energies of both counsel and their clients to prolong this matter, since it is clear to us that the Government has not met, in its own case, the requisite burden of proof as to two significant elements of its case. We shall therefore terminate the case at this point by granting the Debtor's Motion to Dismiss pursuant to B.R. 7041 and F.R.Civ.P. 41(b).

This result is ultimately merciful to the Government as well as to the Debtor, because prolonging this case would merely increase the appropriate award of attorney's fees for which we indicate that the Government is liable under 11 U.S.C. § 523(d). Parenthetically, we note that the standards are the same under either § 523(d) or the Equal Access to Justice Act, 28 U.S.C. § 2412, under which the Government might alternatively be deemed liable for the fees in issue. *See In re Woods,* 69 B.R. 999, 1001–02 (Bankr.E.D.Pa.1987).

An Order consistent with this Opinion shall be entered.