In re Kenneth R. MISTRY, Judith A. Mistry, Debtors.

Homey N. WRITER, Plaintiff,

v.

Kenneth R. MISTRY, Defendant.

Bankruptcy No. 84–03114K.

Adv. No. 85–0905S.

United States Bankruptcy Court, E.D. Pennsylvania.

Sept. 9, 1987.

John A. Wetzel, Philadelphia, Pa., for debtor/defendant.

Christopher G. Kuhn, Philadelphia, Pa., for plaintiff.

John Judge, Philadelphia, Pa., trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION AND PROCEDURAL HISTORY

Plaintiffs in dischargeability cases before us have generally fallen into two categories: (1) Large corporations (usually loan companies) or institutions;[1] (2) Close friends[2] or associates[3]. The former usually have a financial motive for their actions; the latter typically do not, but maintain such actions principally to gain moral satisfaction for alleged wrongs that have been done to them.

The Plaintiff in the instant proceeding is the archetype of the second category of dischargeability-suit plaintiff. Because we find his rendition of a hotly-disputed factual pattern far more believable, due principally to our assessment of the credibility of him and his witnesses as far higher than that of the Defendant and his only witness, his wife, we believe that he has met the stiff burden of proving that, at the time that the Defendant obtained money from him, he did so by knowingly making false representations, and thus we shall proceed

1. *In re Fitzgerald,* 73 B.R. 923 (Bankr.E.D.Pa. 1987) (Social Security Administration); and *In re Woods,* 66 B.R. 984 (Bankr.E.D.Pa.1986) (loan company).

2. *In re Somerville,* 73 B.R. 826 (Bankr.E.D.Pa. 1987) (dictum). Or ex-lovers. *In re Lane, Mori-*

bondo v. Lane, 76 B.R. 1016 (Bankr.E.D.Pa., 1987).

3. *In re Woerner,* 66 B.R. 964 (Bankr.E.D.Pa. 1986), *aff'd.* C.A. No. 86–7324 (E.D.Pa., Order filed April 28, 1987) (former legal counsel).

to enter judgment for the Plaintiff. We do so with the hope that our decision will bring the matter to rest for both parties and they can both go about their lives in a more settled state knowing that dispute-resolution has taken place in this matter.

The underlying bankruptcy case began as a joint Chapter 13 case on September 19, 1984, including the Defendant's wife, JUDITH R. MISTRY, but ultimately evolved into a Chapter 7 case in which the sole Debtor was the Defendant, KENNETH R. MISTRY. On October 10, 1985, the Plaintiff, HOMEY N. WRITER, filed the instant Adversary proceeding, a Complaint to Determine Dischargeability of a Debt pursuant to 11 U.S.C. § 523(a), presumably subsection (2)(A) thereof.

An Answer was promptly filed by the Defendant and a rather substantial volume of pre-trial disputes were generated. After Interrogatories and Requests for Production of Documents were answered, the Defendant sought to depose the Plaintiff, then (and now) residing in Ervine, California. On July 22, 1986, this Court, per our predecessor, the Honorable William A. King, Jr., filed an Opinion and Order granting the Plaintiff's Motion for a Protective Order. The matter then lay dormant until the Defendant listed it for trial, and it was scheduled before us for the first time on March 12, 1987. At that time, we resolved a further discovery dispute by allowing the parties to take telephonic depositions on or before March 24, 1987, and established an accelerated pre-trial schedule requiring the parties to exchange witness lists, exhibits, prepare a Stipulation of undisputed facts, and submit pre-trial Memoranda of Law on or before March 27, 1987; and scheduled the matter for trial on April 2, 1987. The parties fully complied with this Order, although, on March 30, 1987, the Plaintiff filed a Motion for Continuance and for Relief from Order because he had located a new witness, one Raj Kalia, who was unavailable on the trial dates. We denied the Motion, but without prejudice to the Plaintiff to move to supplement the record to add the testimony of Mr. Kalia if it appeared that his testimony would be significant to the result of the case. In light of our disposition of this matter, the issue of receipt of supplemental testimony from Mr. Kalia would appear to be moot.

The trial was conducted on April 2, 1987. A large number of persons attended as "moral support" for the Plaintiff, although only four persons testified, the Plaintiff; his wife, Bacchi Writer; Munchi (Mike) Cooper; and a rebuttal witness, James Boakes. The Defendant and his wife both testified also.

After the trial, we entered an Order of April 3, 1987, directing the parties to arrange to have a desired Transcript of the hearing prepared, which it was projected could be accomplished within thirty (30) days, and Briefs including proposed Findings of Fact and Conclusions of Law were requested from the parties on May 22, 1987, and June 8, 1987, respectively.

Unfortunately, the preparation of the Transcript was delayed until June 16, 1987, and, advising us that ultimately unsuccessful settlement negotiations were taking place, the parties requested and were permitted to extend the dates for submission of Briefs to August 7, 1987, and August 20, 1987, respectively. We have now received same and, after careful review of the Transcript, are prepared to render our decision quickly, as we promised the parties at trial, setting this Opinion forth in the form of Findings of Fact, Conclusions of Law, and a Discussion, as required by Bankruptcy Rule 7052 and Federal Rule of Civil Procedure 52(a).

## B. FINDINGS OF FACT

1. Both parties are natives of India, who now reside permanently in the United States, the Plaintiff as a resident alien in Ervine, California, and the Defendant as a naturalized citizen in Penn Valley in suburban Philadelphia.

2. The parties have known each other since 1954, when both were aboard a merchant training ship, and they developed a close friendship thereafter.

3. Both parties were subsequently employed in marine surveying for a substantial period of time.

4. In summer, 1980, the Plaintiff was living in Dubai, United Arab Emirates, apart from his wife, living with her mother and children in Bombay, India, subsequent to the collapse of a marine surveying business in which the Plaintiff was engaged in Iran with Munchi (Mike) Cooper after the Iranian Revolution in 1979.

5. The Defendant, meanwhile, having immigrated to the United States some indeterminate period before, had, by 1980, financially established himself very well by doing chartering and ship management as well as marine surveying.

6. Although he had been very successful in his business, and owned a large attractive home in the suburban Philadelphia Main Line area, and two expensive cars, the Defendant decided, in mid–1980, to purchase or lease a seat on the floor of the Philadelphia Stock Exchange, which dealt in extremely volatile commodity trading.

7. In the summer of 1980, the Defendant learned, through Cooper, that the Plaintiff was very dissatisfied with his circumstances, and was desperate for means of changing same.

8. After his initial contact with the Plaintiff, the Defendant formulated a plan whereby he believed that he could deceive the Plaintiff into sending him a substantial sum of money and utilize this money to invest in his scheme to become a trader on the Philadelphia Stock Exchange.

9. In furtherance of this Plan, the Defendant, in a series of letters, offered to assist the Plaintiff in immigrating to the United States, where he could reunite his family and settle down.

10. Ultimately, the Defendant informed the Plaintiff that he could and would assist him with the immigration of his family only if the Plaintiff could come up with a substantial sum of money, which should be in the form of a loan to the Defendant, in order to convince immigration officials that he was a person of sufficient means to support himself.

11. The Defendant further represented to the Plaintiff that, because he was a wealthy man who had obtained great success in the United States, he had no need or desire for the Defendant's money. He promised that the money would be put in a bank account and returned to the Defendant on the first day that the Defendant arrived in this country.

12. Upon these representations, the Plaintiff in fact transferred $65,000.00 to the Defendant on or about August 10, 1980, which amounted to most of his life savings and even required his wife to sell many of her jewels, which she testified that most Indian women are very reluctant to do.

13. In phone conversations between the parties, the Defendant advised the Plaintiff to obtain a business or tourist visa, to come to the United States with a minimum amount of luggage, and to destroy all letters between them, purportedly to ease any problems with immigration officials, but in fact in furtherance of his scheme to convince the Plaintiff to send him money and to attempt to destroy any paper trail of evidence of this scheme.

14. The Defendant did not present, either at trial or at any previous time, any written documentation indicating what he in fact did with the $65,000.00 received from the Plaintiff or precisely how it was lost. He claimed that he invested it "like the public does, ... through a regular broker" in the stock market, as a prelude to investment in commodity trading, which he contended that the Plaintiff had fully authorized, and suggested, by implication, that it was lost in such an investment.

15. In late December, 1980, at the Defendant's request, the parties and their wives met in the Taj Mahal Hotel in Bombay. At this time, the Defendant presented the Plaintiff with an unsolicited Judgment Note, dated December 1, 1980, due two years after the date of its issuance at ten (10%) percent interest.

16. The Plaintiff and his wife testified that they received assurances from the Defendant and his wife at this time that their money was safely in an account for them and that the Note was issued only to further ease any problems with immigration

officials regarding the Plaintiff's financial independence. Both were adamant in denying their having given any authorization to the Defendant to invest this money and their having no knowledge that the Defendant would or had done so.

17. Meanwhile, the Defendant and his wife testified that, in conversations between the parties, the Plaintiff and his wife continued to express hope that their planned investments in the stock market would be successful.

18. We find the version of the facts presented by the Plaintiff and his wife far more credible than that presented by the Defendant and his wife for the following reasons:

a. Mr. Cooper convincingly described the Plaintiff as very conservative, i.e., "tight," in financial matters. We thus believe it virtually impossible that he would have agreed to invest most of his life savings in the stock market.

b. The demeanor of the Plaintiff and his wife was passionate, detailed, and imminently believable; that of the Defendant and his wife was vague, distant, evasive, and replete with generalizations.

c. The pattern of facts suggests that, by December, 1980, the Defendant had already spent and probably lost the Plaintiff's money in his commodity trading business, and that he arranged the meeting and introduced the Note to attempt to construct a paper trail to obfuscate the actual facts.

19. In July, 1981, the Plaintiff and his family arrived in this country, with only minimal luggage, and the remainder of their life savings, $7,000.00 in traveller's checks, in their possession.

20. The Defendant met them at the airport, established them in an apartment which he had rented for them, and was a gracious host to them, but put off all of the requests by the Plaintiff for return of his money on the first day of his arrival, and shortly thereafter, as he had promised.

21. On or about August 11, 1981, stopping on a trip into Center City Philadelphia in Fairmount Park, and dramatically indicating that he had considered suicide as a prelude, the Defendant informed the Plaintiff that the money which he had paid to the Defendant had been lost in the stock market.

22. While the Defendant and his wife promised to sell off their cars and furs, respectively, to repay the Plaintiff, in fact the Defendant was in the midst of a downward spiral in his commodity trading activities which resulted in his subsequently making an $85,000.00 loan in exchange for a second mortgage on his home; loss of the home when he was unable to make the loan payments; and the instant bankruptcy case.

23. The Defendant never repaid any portion of the $65,000.00 of the Plaintiff's money to him, nor accounted to him for its loss.

24. The Plaintiff and his family ultimately, with difficulty, survived financially by doing babysitting and receiving assistance from members of a church which they joined shortly after their arrival, and have continuously remained in the United States ever since.

## C. CONCLUSIONS OF LAW

1. The Defendant obtained the $65,000.00 sum paid to him by the Plaintiff by misrepresentations regarding his intentions for the use of this money which he knew were false, and upon which the Plaintiff reasonably relied.

2. The debt of the Defendant to the Plaintiff was hence obtained by false pretenses, false representations, and actual fraud, within the scope of 11 U.S.C. § 523(a)(2)(A).

3. The debt of the Defendant to the Plaintiff is therefore non-dischargeable.

## D. DISCUSSION

The law in this area is quite clear. The applicable Code section, 11 U.S.C. § 523(a)(2)(A), provides as follows:

Sec. 523. Exceptions to discharge.

(a) A discharge under Section 727, 1141, or 1328(b) of this title does not

discharge an individual debtor from any debt—

.    .    .    .    .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; ...

We do not think that we can improve upon the statement that we made regarding the burden of proof and the elements that must be proven to succeed in a proceeding brought under this Code section in *In re Fitzgerald,* 73 B.R. 923, 926 (Bankr. E.D.Pa.1987):

Because "[e]xceptions to discharge are narrowly construed against the creditor, and in favor of the debtor," *In re Gelfand,* 47 B.R. 876, 879 (Bankr.E.D.Pa. 1985) (per KING, J.), *see also, e.g., In re Decker,* 595 F.2d 185, 1987 (3d Cir.1979); and *Woerner, supra,* 66 B.R. at 971, the burden of proof is squarely upon the [creditor] to prove " 'all of the elements of fraud by clear and convincing evidence,' " *In re Woods,* 66 B.R. 984, 988 (Bankr.E.D.Pa.1987) (quoting *In re Smith,* 54 B.R. 299, 301 (Bankr.S.D.Iowa 1985), in order to prevail in a proceeding challenging dischargeability of a debt under § 523(a)(2)(A). *Accord, e.g.: In re Phillips,* 804 F.2d 930, 932 (6th Cir.1986); and *In re Hunter,* 780 F.2d 1577, 1579 (11th Cir.1986).

... it is well established, in opinions written by both the present and the past Chief Judges of this Court, that there are five "elements" which the [creditor] must prove, which are as follows:

(1) that the debtor made the representations;

(2) that at the time he knew they were false;

(3) that he made them with the intention and purpose of deceiving the creditor;

(4) that the creditor relied on such representations; and

(5) that the creditor sustained the alleged loss and damage as the proximate result of the representations having been made.

*In re Hammill,* 61 B.R. 555, 556 (Bankr. E.D.Pa.1986) (per TWARDOWSKI, J.); and *In re Taylor,* 49 B.R. 849, 851 (Bankr.E.D.Pa.1985) (per GOLDHAGER, CH. J.).

█ It also should be underscored that the Plaintiff must establish not only that his money was misappropriated by the Defendant but that the Debtor fraudulently misrepresented the purposes for which he intended to use the funds at the time he received them. *Cf. Lane, supra,* at 1022 n. 4.

The burdens of the Plaintiff to proceed in this action are therefore considerable, but we believe he had met them in light of our above Findings of Fact. As we indicated in Finding of Fact 18, all of the classic elements for weighing credibility cause us to accept the Plaintiff's version of what occurred to that of the Defendant, i.e., the relative demeanor of the witnesses; support from disinterested witnesses such as Mr. Cooper,[4] who has had his own share of friction with the Plaintiff over the years; and the weight of the relative plausibility of the parties' stories. We quite agree with Mr. Cooper's statement that it is unconceivable that the Plaintiff and his wife, whose uncle reportedly lost heavily in the stock market in the past, would agree to invest most of their life savings in a risky stock-market transaction.

Both the Defendant and his wife were not credible witnesses. The Defendant tended to speak in generalities and without animation or detail, until he began to speak of the commodity market and the manner

---

**4.** The Defendant's counsel made an ineffective attempt to insinuate that Mr. Cooper would be motivated to lie for the Plaintiff to repay him for his previous debts and wrongdoings to the Plaintiff in the break-up of their business after the Iranian Revolution. We discount this motive completely because, while the Plaintiff may have thought Mr. Cooper owed him money and had done wrong by him, Mr. Cooper quite apparently disagreed with the assessment and hence, in his view, had no obligation to "repay" the Plaintiff.

in which considerable funds can be made—and lost—on the stock exchange floor in a matter of seconds. It is clear to us that he presents an individual who became passionately and destructively involved in the commodity trading market. His quest for funds to feed this undertaking was sufficiently voracious, we believe, to cause him to use his long friendship with the Plaintiff and the Plaintiff's desperate condition as a resource to implement his need for funds. Thus, in Finding of Fact 8, we conclude that his entire course of dealing with the Plaintiff was, from the outset, part of a plan to get his money to obtain funds to invest in the commodity market.

In analyzing the criteria for a successful § 523(a)(2)(A) action which we quoted from our Opinion in *Fitzgerald, supra,* we are compelled to make a general observation at the outset. We find that the crux of the false representations made by the Defendant concerned the purpose for which he intended to use the money that the Plaintiff sent to him. The Brief of the Defendant attempts to splinter the nature of the purported misrepresentations into various specifics related to the Plaintiff as part of the Defendant's general scheme, i.e., that he owned a large house and two cars, that he consulted an immigration lawyer, and that he failed to return the money immediately upon the Plaintiff's arrival in the United States. However, although certain elements which were stated by the Defendant in furtherance of his scheme may indeed have been true, i.e., he did have the house and cars and he did consult immigration lawyers, and he undoubtedly thought that he would do well in the stock market and be able to return all of the Plaintiff's money to him on the first day that he arrived in this country, these do not constitute, in our view, the material misrepresentations in issue. Rather, the misrepresentation upon which we believe that we must focus is the entire scheme of using the Plaintiff's money for a different purpose than that for which it was intended. In this regard, the Plaintiff's citation to *In re Jones,* 50 B.R. 911 (Bankr.N.D.Tex.1985), is directly on point. *Cf. In re Alspach, Coni-*

*bear v. Alspach,* 76 B.R. 499 (Bankr.E.D. Pa., 1987).

Proceeding through the five criteria quoted from *Fitzgerald* at page 511 *supra* above, we therefore conclude that the Plaintiff made out each and every element by the requisite clear and convincing evidence as follows: (1) The Defendant misrepresented the purposes for which the Plaintiff's money was needed and would be used; (2) He knew that these representations were false from the outset; (3) He made them solely to deceive the Plaintiff; (4) The Plaintiff reasonably relied upon them; and (5) The loss of the money occurred as the direct result of the purpose for which the funds were in fact used as opposed to the represented purpose, i.e., they were invested in a volatile stock market instead of being placed in a bank, as the Defendant had promised that they would be.

We recognize that the record contains only circumstantial, as opposed to direct, evidence of what the Defendant's scheme in fact was and what he did with the Plaintiff's money. However, a scheme can only *ever* be proven by circumstancial evidence unless the party promulgating the scheme makes the mistake of admitting his intentions. The disposition of the Plaintiff's money is a mystery known only to Mr. Mistry; however, it is difficult to believe that an investment in anything but the commodity market would have evaporated entirely in less than a year, and the refusal of the Defendant to provide any specific explanation or documentary evidence of where the money actually went is extremely suggestive of a lack of credibility on his part on this very important point.

The touchstone of our decision is, thus, our adverse credibility determination as to the explanations tendered by the Defendant and his wife regarding the dealings between the parties. As we indicated in *Somerville, supra,* 73 B.R. at 833, 837, 838, we believe the issue of credibility to be crucial in a § 523(a)(2) matter, as well as a § 727(a) matter. In *Somerville,* our disdain for the Debtor's lack of concern for the truth led us to conclude that he was not an *honest* debtor. 73 B.R. at 828. In

*Woods*, we refused to make an adverse credibility decision against the Debtor because the creditor's story, as opposed to the Debtor's story, on a crucial point, failed to hold up logically. 66 B.R. at 988–89. Here, it is the Defendant's story which blinks at reality at every turn.

Having said all of the foregoing, and indicated why we must rule in favor of the Plaintiff, we nevertheless must indicate that we are not without sympathy for the plight of the Defendant. His attraction to the commodity market, as he described it, was apparently an obsession. We believe that he was almost as powerless before the force of this obsession as is a compulsive gambler or a drug addict, who takes advantage of even those that he loves the most to fulfill his cravings. Thus, we believe that the Defendant has had no more intention of harming the Plaintiff than a gambler does of losing, or than he had of losing his own home and his automobiles.

We also should note that, at least indirectly, the actions of the Defendant worked to the benefit of the Plaintiff and his family in the long run. Had it not been for his intervention, it is doubtful that the Plaintiff and his wife would have immigrated to the United States, where they have been able to reunite their family and prosper. Hence, we cannot attach either venialness or causation of consequences of permanent harm to the Plaintiff as a result, to the Defendant's actions. We hope, life being as short as it is, that these two erstwhile friends can, at least to some degree, mend their understandably hard feeling towards one another.

Be that as it may, we conclude that it is our duty to enter the attached Order based on the reasoning set forth in the within Opinion.