**In re Irwin & Roberta STELWECK, Debtors.**

**In re Alfred & Agnes STELWECK, Debtors.**

**UNITED STATES of America, Plaintiff,**

**v.**

**Irwin STELWECK, Defendant.**

**UNITED STATES of America, Plaintiff,**

**v.**

**Alfred STELWECK, Defendant.**

**Bankruptcy Nos. 86–01403S, 86–01402S. Adv. Nos. 86–0487S, 86–0486S.**

United States Bankruptcy Court, E.D. Pennsylvania.

May 26, 1988.

As Amended June 6, 1988.

Jerome J. Verlin, Philadelphia, Pa., for debtors/defendants.

Steven Usdin, Philadelphia, Pa., for trustee.

Catherine Votaw, Asst. U.S. Atty., Philadelphia, Pa., for plaintiff.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### INTRODUCTION AND PROCEDURAL HISTORY

The instant consolidated adversarial proceedings present an interesting procedural issue regarding the role of bankruptcy courts in deciding dischargeability complaints, a novel substantive issue regarding interpretation of 11 U.S.C. § 523(a)(7), and a difficult and detailed factual analysis to resolve claims raised under 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(6). Procedurally, we decide that bankruptcy courts can determine whether unliquidated debts are dischargeable, but should only determine dischargeability rather than the amount of damages arising from the underlying debt. We hold that § 523(a)(7) does not embrace claims under the federal False Claims Act, 31 U.S.C. § 3729, et seq., because they are in the nature of compensation rather than punishment. Finally, we hold that the record does not support a finding that the debts are non-dischargeable under §§ 523(a)(2)(A) or 523(a)(6). Therefore, we render judgment in favor of the Defendants.

Irwin and Roberta Stelweck and Alfred and Agnes Stelweck filed their respective underlying Chapter 7 Petitions in this Court on March 24, 1986. The Plaintiff, the United States of America (hereinafter referred to as "the Plaintiff"), filed the instant adversarial proceedings against Irwin and Alfred Stelweck, who are brothers (hereinafter referred to as "the Defendants"), on May 30, 1986. The Defendants were officers in a company known as E & S Comfort Inc. (hereinafter referred to as "E & S"), which sold seat-lift chairs. The Plaintiff filed the present adversary proceedings against the Defendants alleging that the Defendants submitted fraudulent claims for reimbursement for their product to Medicare. The Plaintiff asks this Court to not only declare the obligations of the Defendants to the Plaintiff non-dischargeable, but to impose damages for the Defendants' alleged fraud, including penalties under the federal False Claims Act which total in excess of $10 million.

Disposition of these proceedings was delayed in earlier stages due to their entanglement with their four other related adversary proceedings: (1) An action by the Trustee in the Chapter 11 case of E & S (Bankr. No. 85-05474K) to recover certain claims against the Plaintiff herein (Adv. No. 86-0197K); (2) A counterclaim by the Plaintiff to recover for claims wrongly paid (Adv. No. 86-0431S); and (3) Actions by the Trustee against each of the Defendants herein (Adv. Nos. 86-1124K and 86-1050K). On April 13, 1988, we approved a complex Stipulation of Settlement of Adv. Nos. 86-0197K and 86-0431K, featuring the agreement of the Plaintiff to pay the E & S Trustee $1 million. The disposition of Adv. Nos. 86-1124K and 86-1050K shall be considered at a status conference presently scheduled for June 15, 1988.

Trial in these matters, which we broke loose from its entanglement with the other proceedings, was conducted on January 7 and 8, 1988. After completion of the Transcripts, the Plaintiff and the Defendants submitted proposed Findings of Fact, Conclusions of Law, and post-Trial Memoranda of Law on March 18, 1988, and April 6, 1988. Pursuant to Bankruptcy Rule 7052 and Federal Rule of Civil Procedure 52(a), we present our decision in the form of Findings of Fact, Conclusions of Law, and a Discussion.

### FINDINGS OF FACT

1. E & S is a Pennsylvania corporation whose business was the sale of seat-lift chairs, i.e., chairs which mechanically ele-

vate a person from a sitting to a standing position and vice-versa.

2. E & S received reimbursement from Medicare for seat-lift chairs sold to Medicare recipients. The overwhelming majority of seat-lift chairs marketed by E & S were sold to Medicare recipients. As a result, E & S's main source of income was reimbursement from Medicare.

3. Prospective customers contacted E & S by phone to order their seat-lift chairs. Upon such a contact, E & S would send a Medicare Claim form (Form HCFA–1500A) (hereinafter referred to as "the claim form") to be completed by the prospective customer/Medicare recipient (hereinafter referred to as a "beneficiary"). About the same time, E & S sent a form letter to the beneficiary's physician requesting that the physician complete a Certificate of Medical Necessity form (hereinafter referred to as a "CMN"). Both forms were provided by Pennsylvania Blue Shield. These forms were subsequently returned to E & S by the beneficiaries. E & S would then make arrangements to deliver a chair to the beneficiaries prior to submitting a claim to Medicare for reimbursement.

4. The Medicare program is administered by the Health Care Financing Administration (hereinafter "HCFA"), an agency of the Plaintiff's Department of Health and Human Services (hereinafter "HHS"). HHS has contracted with Pennsylvania Blue Shield (hereinafter "Blue Shield") to process Part B Medicare claims, including seat-lift chairs.

5. Blue Shield required the submission of a completed claim form and CMN prior to approving Medicare reimbursement for a seat-lift chair.

6. Eileen Cohen (hereinafter "Cohen") was the President of E & S, and was employed full-time with the company from its inception in May, 1984, until January, 1986. Her job duties included reviewing claims prior to submission to Blue Shield to insure that the forms were properly completed; contacting physicians with questions regarding the CMN's; responding to calls or complaints from beneficiaries; dealing with personnel matters; and billings. In addi-

tion, Cohen also was involved with advertisement and shipping for the company.

7. The claim forms had to be signed by the physician or other supplier of medical services. By signing the claim form, such supplier certified that the services billed for "were medically indicated and necessary for the health of the patient." (Government Exhibit 1, at 1).

8. Each of the contested claim forms were signed by either one of the Defendants or Cohen as the supplier of medical services.

9. The CMN's included a space for the attending physician to indicate the patient's diagnosis. The Form provided that "SIGNATURE OF THE PHYSICIAN CERTIFIES THAT THE ABOVE REPRESENTS HIS JUDGMENT OF THE PATIENT'S NEED FOR THE EQUIPMENT." (*Id.* at 3).

10. There were three different sets of standards for determining whether a seat-lift chair qualified for Medicare reimbursement in effect during the time that the contested claims were submitted. These were the Medicare coverage issues Appendix for seat-lift chairs (hereinafter referred to as the "Medicare Appendix"); the Medicare Claims Payment Decision Logic Table for seat-lift chairs (hereinafter referred to as the "Logic Table"); and the Typical Diagnosis List for a seat-lift chair.

11. The Medicare Appendix is from the Medicare Carrier's Manual published by HCFA and provides in pertinent part that

[r]eimbursement may be made for the rental or purchase of a medically necessary seat lift when prescribed by a physician for a patient with severe arthritis of the hip or knee and patients with muscular dystrophy or other neuromuscular diseases when it has been determined the patient can benefit therapeutically from use of the device.

12. The Logic Table was utilized by Blue Shield claim processors processing claims for seat lift chairs. Rule 1 of the Logic Table provided that beneficiaries with the following conditions were entitled to reimbursement for a seat lift chair:

—Severe arthritis of the hip or knee, i.e.,

Rheumatoid arthritis

Osteoarthritis

Osteoporosis

Inflammatory polyarthritis

Degenerative Joint Disease (DJD)

Severe ankylosing spondylitis

Arthritis described as crippling, degenerative, or generalized

*NOTE:* With any of the conditions above, there must be hip and/or knee involvement.

—Neuomuscular Diseases, i.e.,

Muscular dystrophy

Multiple Sclerosis

Landry's Ascending Paralysis

Polimoylitis [sic]—involving both legs

Parkingson's [sic] Disease

Myasthenia gravis

Amyotrophic Lateral Sclerosis

Guillian–Barre Syndrome—Infectious polyneuritis, acute ideopathic polyneuritis

—Paralysis,paresis, paraplegic, hemiparesis, any diagnosis with paralysis, i.e., CVA (stroke) with paralysis; degeneration of spinal column with paralysis.

If the diagnosis on the CMN was not one contained in Rule 1 but related to a patient's hip or knee, then the claim had to be reviewed by a physician employed by Blue Shield before determining whether to deny or approve the claim under Rule 2. Pursuant to Rule 3, if the diagnosis was not contained in Rule 1 and did not relate to the patient's hip or knee, then the claim was denied by the claims examiner.

13. The Typical Diagnosis List simply lists diagnoses which typically will qualify for Medicare reimbursement. This list includes the following:

Advanced Parkinson's Disease

Cerebrovascular Accident with Apraxia

Muscule[sic] Atrophy

Polymyositis

Severe Arthritis of the Hips or Knees

Severe Osteoarthritis of the Hips or Knees

Severe Rheumatoid Arthritis of the Hips or Knees

14. When E & S first started business in 1984, Blue Shield provided the company with a set of claim forms and CMN's. At the request of Cohen, Blue Shield later provided E & S with the Typical Diagnosis List. E & S provided this list to physicians together with the CMN's to be completed. The list originally provided did not include the words "with hip & knee involvement" next to Severe Osteoarthritis of the Hips and Severe Osteoarthritis of the Knees. Blue Shield did not provide E & S with copies of either the Medicare Appendix or the Logic Table.

15. Many of the claims initially submitted by E & S were denied by Blue Shield because they did not meet any of the diagnoses listed on the Logic Table.

16. When Cohen had a question regarding a claim that was denied, she contacted Jill C. Shaffer (hereinafter referred to as "Shaffer"), who was a telephone customer service representative with Blue Shield. Cohen spoke to Shaffer approximately two or three times a week, at which times they discussed how to properly complete the forms and claims that had been denied.

17. According to Shaffer, when Cohen called with a question about a claim, she would pull copies of the claim form and certificate to discuss with Cohen. However, on cross-examination, Shaffer denied ever viewing E & S claim forms after they had been denied.

18. Shaffer advised Cohen that, in order for a claim to be approved for a beneficiary with arthritis, the diagnosis on the claim form must indicate that the arthritis was severe and that it affected the beneficiary's knees and/or hip.

19. If a claim form was not properly completed, Blue Shield would either return the form to the provider with directions to re-submit the claim form with any corrections necessary to process and approve a claim, or provide the supplier with written notice that the claim was denied.

20. Early in the company's operation, approximately two hundred (200) unprocessed claim forms were returned to E & S by Blue Shield with a note indicating that the diagoses had to specify that the pa-

tient's arthritis involved the hips and/or knees.

21. It is clear that Cohen believed that in order for a claim involving a diagnosis of arthritis to be approved by Blue Shield, it had to include the "magic language" relating specifically to severe arthritis of the hip or knee with hip and/or knee involvement. It is not clear that Cohen was advised that this language was required on each claim form for customers with arthritis. It is possible that this was simply Cohen's understanding from her conversations with Shaffer. However, Cohen's testimony regarding her understanding of Blue Shield's requirements was credible and consistent with Shaffer's testimony in this regard.

22. Cohen added the typed language "with hip and knee involvement" on her copy of the Typical Diagnosis List after her conversations with Shaffer.

23. Shaffer testified that she had advised Cohen that there were two ways to "correct" a CMN. By the first method, the provider submitting the claim could contact the physician by telephone and obtain the additional information which could be added to the CMN. However, according to Shaffer, in order to properly add any additional information to a CMN, the provider had to (1) state that the addition was a correction; (2) state that the information was obtained via telephone call; and (3) return the CMN to the physician to re-date and initial the change. According to the second method, the provider could send the physician a new, blank CMN to be completed.

24. No written policy or manual sets forth the proper procedures to follow when "correcting" a CMN. Shaffer's directions to Cohen were never put in writing.

25. Cohen testified that she spoke to Shaffer frequently regarding the Medicare claims process and that Shaffer was generally helpful. According to Cohen, Shaffer advised her to obtain a stamp to use on the claim forms that read "add 99 months of Necessity To Pay in 1 Lump Sum" in order to receive reimbursement on E & S's claims in one lump sum. This stamp in fact appears on many of the claim forms admitted into evidence in this case.

26. According to Cohen, she was advised by Shaffer to add "hip and knee involvement" to claims involving arthritis in order to be paid. Also, according to Cohen, she was *not* advised that it had to be noted on the CMN that the addition or change was authorized by the physician.

27. Almost all of the disputed claims admitted into evidence in this case contained typing on the CMN. This typing was added by employees of E & S at the direction of either the Defendants or Cohen after the CMN was returned to the company by the attending physician.

28. E & S was never provided with written or oral notice that any individual or group of claims was denied or reimbursement withheld due to typing on the CMN's prior to November, 1985.

29. No employee of Blue Shield ever advised E & S that the claims were completed incorrectly either due to the additional typing or the lack of the physicians' initials. According to Shaffer, the claims department assumed that whatever was on the CMN was in fact authorized by the physician.

30. Shaffer appeared to the court to be a loyal employee who was reluctant to admit that either she or her employer made any mistakes in this process. This attitude appeared to color her memory and responses (i.e., her refusal to admit on cross-examination that she had in fact viewed claims from E & S which had been rejected). Cohen, on the other hand, while not appearing to be as familiar with Medicare requirements as Shaffer, appeared to be generally credible in her recitations. Cohen could recall the approximately number of claims initially returned to E & S for reprocessing and remembered directions given by Shaffer in other matters, i.e., the "99 months" stamp. For these reasons, we credit Cohen's testimony regarding her conversations with Shaffer. At a minimum, we find that Cohen testified truthfully regarding her understanding of Shaffer's directions, even though it may have been a misunderstanding.

31. Cohen testified that she or one of the Defendants contacted the signatory physician for approval before making any additions to the diagnoses on the CMN's. When claim forms were received in the office, they were reviewed to determine if they were complete and if the diagnosis was one contained on the Typical Diagnosis List. If the diagnosis was not a qualifying diagnosis, the signatory physician would be contacted and asked for additional information regarding the customer's impairment.

32. The claim forms were placed in one of three piles depending on the outcome of the above conversation. Claim forms for customers not suffering from a qualifying impairment were placed in one pile. These forms were filed and were not submitted to Blue Shield for reimbursement. A second pile contained claim forms for customers suffering from some form of arthritis or degenerative bone disease which was both severe and involving either the knees or hips. This pile was given to the typists with directions to add the "magic language," i.e., "severe—with hip and knee involvement." The third pile included claim forms for beneficiaries whose physicians indicated that they suffered from qualifying impairments in addition to those originally listed on the CMN. These forms were given to the typists with a piece of paper indicating the additional information to be typed onto the CMN.

33. There were three typists employed by E & S to process the claim forms prior to their submission to Blue Shield, Esther Tuner (hereinafter referred to as "Tuner"), Lori Johnston (hereinafter referred to as "Johnston"), and Janet Gomer. Tuner and Johnston testified in this matter.

34. Tuner testified that she was instructed that, when she received a claim form, she was to check the diagnosis on the physician's certificate to make sure that it matched a diagnosis on the Typical Diagnosis List. Tuner testified that if the diagnosis was not on the list, she was directed to type in "severe arthritis of hips and legs with hip and leg involvement." Tuner further testified that she processed one hundred (100) to one hundred and twenty-five (125) claims per day. On cross-examination, Tuner testified that she did not know if a physician had been contacted regarding the diagnosis before the form was given to her.

35. Johnston testified that she also would compare the diagnoses on the claim forms with those on the Typical Diagnosis List. If the diagnosis was arthritis, Johnston would type in "severe ... with hip & knee involvement." On direct, Johnston testified that she did not receive notes on individual claim forms. However, on cross-examination, Johnston testified that she did not remember if she had received notes on the claim forms. Johnston also testified that she was advised that the particular language typed was required by Medicare to process the claims for reimbursement. If Johnston had a question about a diagnosis, she would return the form to the Defendants or Cohen, which she did frequently.

36. If a claim was denied by Blue Shield, the supplier could pursue an administrative appeal and would be afforded a hearing. At that hearing, the supplier would have an opportunity to submit additional evidence in support of its claim for reimbursement from Medicare, including supplemental information from the physician who completed the CMN.

37. All of the disputed claims at issue in the present adversarial proceedings were approved and paid by Blue Shield. As a result, there was no need for any party to to request or for Blue Shield to hold an administrative hearing with respect to these now contested Medicare claims.

38. All of the contested claims were accompanied by completed CMN's wherein the beneficiary's treating physician certified that, in his or her judgment, the seat-lift chair was necessary for the health of his or her patient. None of these CMN's were forged.

39. When processing a seat-lift chair Medicare claim, the Blue Shield claims processors would check to make sure that the claim was accompanied by a CMN signed by a physician and that the diagnosis matched one contained in the Logic Table

before approving the claim. In comparing diagnoses, the claims processors would consider the language typed by employees of E & S as well as the handwritten language of the physicians.

40. Any language added by E & S to the diagnoses was typed. Employees of E & S never attempted to imitate the physician's handwriting or to otherwise write the additional language so that it appeared to be written by the physician.

41. The claims processors at Blue Shield routinely processed and approved forms which contained both typing and handwriting on the diagnosis line. There was no evidence that any claims processor brought this situation to the attention of a supervisor prior to mid–August, 1985.

42. Lois K. VanOrden (hereinafter referred to as "VanOrden") is the manager of the Medicare Utilization Review Department at Blue Shield. She testified that, in or about mid–August 1985, all claims for Medicare reimbursement for seat lift chairs were subject to more intensive review. As part of this modified claims procedure, physicians were required to complete a detailed functional capacities questionnaire in addition to completing the CMN. HCFA had requested that Blue Shield take extra precautions in paying seat-lift claims because it appeared that suppliers were using standardized language on physician's certificates. Van Orden was not advised of the typing on the contested E & S claim forms until after mid–August, 1985.

43. In late November, Blue Shield received a directive from HHS advising it to suspend any future payments to E & S. According to this directive, HHS was conducting an investigation into the Medicare billings of E & S. On November 27, 1985, Van Orden sent E & S a letter advising it that reimbursement for all of its claims would be withheld thereafter. Neither letter mentioned the typing on the CMN's as as basis for this action. All reimbursement for claims submitted by E & S was withheld after November 27, 1985, and the monies owed to E & S were placed in an escrow account. The disputed claims at issue in the present matter were all paid by Medicare prior to the November, 1985, directive.

44. Between November, 1985, and January, 1986, Cohen and the Defendants spoke to and met with representatives of Blue Shield and Medicare several times to discuss the status of E & S's pending claims. During this period, E & S was not advised, either orally or in writing, that there was a problem regarding the typing on the CMN's.

45. As a result of the loss of Medicare reimbursement, E & S was unable to continue to meet its regular financial obligations and laid off all of its employees. On December 19, 1985, an involuntary bankruptcy petition was filed in this Court against E & S, and a Trustee was appointed on January 2, 1986.

46. The Trustee filed Adv. No. 86–0197S, referenced at page 3 *supra,* against HCFA and Blue Shield to compel turnover of the funds being held in escrow by Blue Shield for the claims submitted by E & S. HCFA filed an Answer and Counterclaim at Adv. No. 87–0431S, alleging that it was entitled to an offset against any funds which may be due E & S and seeking damages against E & S for alleged fraud on the part of the Debtor under the federal False Claims Act, 31 U.S.C. § 3729(a). The Stipulation of Settlement settling this dispute, referenced at page 3 *supra,* provides, *inter alia,* as follows: (1) E & S had approximately 3,300 claims pending before Blue Shield; (2) The Plaintiff shall pay the Trustee one million ($1,000,000.00) dollars in settlement of those claims; and (3) The alleged 789 claims previously submitted by E & S and paid by Blue Shield which are in issue in these proceedings are exempted therefrom.

47. Robert Taylor (hereinafter referred to as "Taylor") is a program analyst with HHS, Office of Inspector General. In late 1985, Taylor conducted an investigation into possible overutilization or abuse by E & S in providing seat-lift chairs to Medicare recipients. Taylor was called to testify on behalf of the Defendants.

48. Taylor testified that, in May, 1987, he prepared the results of a survey of

thirty (30) to thirty-five (35) of the approximately eight hundred (800) beneficiaries in issue who had purchased seat-lift chairs from E & S. As part of this survey, Taylor interviewed both the beneficiary and his or her physician. Taylor testified that, during the course of his investigation, he observed at least three beneficiaries engaged in activities such as climbing or sitting on stairs, which led Taylor to conclude that the person did not need a seat-lift chair. However, every doctor contacted indicated that he or she had prescribed the seat-lift chair, although one doctor indicated that he had done it simply as a favor to his patient. None of the doctors indicated that their signatures had been forged on the CMN's.

49. Included among the claims admitted as exhibits in this case were three questionnaires completed by Taylor in doing the survey. They indicate the following:

a. Hilda Levy—The physician's questionnaire indicates a diagnosis of atrophy of the left leg, DJD [degenerative joint disease], spinal stenosis, and possible herniated disc. Her doctor indicated that she was unable to walk independently and that she would have to use a seat-lift chair indefinitely. The questionnaire completed by Taylor indicates that the information contained on the CMN was correct.

b. Mary Nahon—The physician questionnaire contains a diagnosis of "CVA [cerebrovascular accident or stroke], DJD (Advanced); involved in auto accident and severely injured." While Nahon's physician failed to identify the location of Nahon's DJD, the patient questionnaire indicates "osteoarthritis of knees." The doctor indicated that patient's prognosis was "Poor–Dying" and that she would need a seat-lift chair indefinitely. Taylor's questionnaire indicates that the information contained on the CMN was correct.

c. Elizabeth Sharpe—The beneficiary questionnaire indicates "medical problems, has arthritis but not crippling." The physician questionnaire indicates a diagnosis of "Diabetes/Arthritis-Some Stiffness–Arthritis Not Considered Severe." Taylor's questionnaire indicates that the CMN was not correct since Sharpe's "arthritis is not severe or crippling." However, on the CMN, Sharpe's doctor had written a diagnosis of "Arthritis of Hips & Knees" and a prognosis of "guarded." The additional typing on Sharpe's form states "with hip & knee involvement." It is significant to note that the additional typing on Sharpe's CMN does not indicate that the arthritis was severe. If in fact E & S routinely added "severe" and "with hip & knee involvement" to every form which indicated that the beneficiary had Arthritis, one would expect an addition of "severe" to Sharpe's form.

50. Charles Arthur Tress (hereinafter referred to as "Tress") is the Manager of the Medicare Fair Hearing office. At the request of Blue Shield, Tress reviewed 849 claims submitted by E & S which had been reimbursed to determine if they should have been paid based solely on the handwritten diagnosis on the CMN without considering any typewritten material on the form. In making these determinations, Tress used the Logic Table utilized by Blue Shield claims examiners. When acting in his normal capacity as a hearing officer, however, Tress bases his decisions on the Medicare statute and regulations and a Carrier's Manual published by HCFA. If a diagnosis was illegible or not sufficiently specific (i.e., as to the affected part of the patient's body), Tress determined that the claim should have been denied.

51. Tress testified that, of the 849 claims that he reviewed, only 59 should have been paid based only on the handwritten diagnosis. On cross-examination, he indicated that with additional information, some of the claims could have been approved.

52. Neither the total number of claims submitted by E & S to Blue Shield nor the number of such claims that included typing added to the CMN's were established with any degree of certainty. The government produced a list of 849 claims that were paid that had typing on the CMN's diagnosis. Cohen estimated that, as of November, 1985, E & S had 5,000 to 6,000 claims pending with Blue Shield which had been submitted some time after the company

began doing business in May, 1984. The Stipulation entered in Adv. No. 86–0197S refers to 3,300 pending claims.

53. We consider the testimony of Tuner that she processed 100 to 125 claims per day to be an overestimation. If in fact the three typists were processing 100 claims a day for the approximately eighteen months that E & S was operating at its full capacity, then E & S would have submitted a total of approximately 118,800 claims and would have delivered that many seat-lift chairs. We find this estimation to be incredible and unsupported by the record.

54. The Plaintiff submitted 789 of the disputed claim forms as evidence in this case.

55. All but two of the claims admitted into evidence were reduced copies of the original claim forms. Most of the copies admitted were of a poor quality. Many of the copies were light and/or blotchy. In addition, the physician's handwriting was illegible on at least 75 of the forms admitted into evidence.

56. According to the physicians' handwritten diagnoses on the CMN's, the majority of the disputed claims were for beneficiaries who suffered from some form of arthritis, including osteoarthritis, rheumatoid arthritis, gouty arthritis, or degenerative joint disease.

57. Approximately 70 claims admitted involve nonarthritis diagnoses involving the hips or knees.

58. Approximately 41 claims admitted involved diagnoses of CVA or stroke.

59. The majority of handwritten diagnoses did not indicate the level of severity of the impairment, i.e., severe, moderate, etc.

60. The majority of the CMN's involved elderly persons, many if not most of whom were over 70 years of age.

61. The majority of the prognoses on the CMN's were poor or guarded, for example:

*Charles Cardile*—Arthritis of low back and hip joint; Prognosis—poor

*Jean Amendolari*—Rheumatoid Arthritis of knees, hips, hands; Prognosis—guarded

62. The physicians' handwritten diagnosis generally did not specify the location of the arthritic or neuromuscular condition, for example:

*Sister Mary Grace Varallo*—CVA [stroke], severe arthritis, Prognosis—guarded

*Margaret Barone*—Muscular Attrophy secondary to Poliomyelitis [typed: of lower extremities]

*Lillian Berger*—Spondylosis, Osteoporosis, Osteoarthritis

*Madeline Kamerling*—DJD

*John Whittaker*—Pernicious Anemia and Osteoarthritis, severe; Prognosis—poor

63. A number of handwritten diagnoses on the CMN's for the contested claims appear to match diagnoses in Rule 1 of the Logic Table, for example:

*Ellen Franklin*—Degenerative Arthritis of both knees

*Rose Greenbaum*—DJD of knees and hip

*Gina Giampietro*—CVA with right sided paresis

*Norma Hullings*—Hemiparesis

*Mary John*—Severe Osteoarthritis of hips and knees

*Rosemary Kelly*—Rheumatoid Arthritis of the legs

*Mary Kowalski*—Osteoarthritis of knees, hips, spine

*Rosaria LaRocca*—Spondylitis, Osteoarthritis knees and hips

*Giovanni Vinacio*—Osteoarthritis of knees and low back; Prognosis—guarded (age 92)

64. A number of handwritten diagnoses appear to qualify for consideration for Medicare funding under Rule 2. This rule relates to other (non-Rule 1) diagnoses which involve the hip or knee. Under this Rule, the claim would be reviewed by a doctor employed by Blue Shield to Determine eligibility for Medicare funding, for example:

*Ruth Marshall*—Above knee amputation, left leg; hemiarthroplasty, medical compartment, right knee

*Anna Cerny*—Degenerative arthritis of spine/status post fractured hip (age 95)
*Saverio Ciamarra*—S/P fracture right hip, COPD, contusion of spinal cord
*Irwin Hollander*—Bi-lateral leg amputation
*Virginia R. Payne*—Status post-total hip replacement L/degenerated R/hip

65. Many of the CMN's submitted contained multiple diagnoses.

66. A few CMN's were accompanied by prescriptions written by the physician on his or her prescription pad.

67. The typing on approximately 600 of the contested CMN's included the words "severe _____ of hips and knees with hip and knee involvement" or just "of hips or knees with hip and knee involvement."

68. Some of the CMN's contained typing not found on the Typical Diagnosis List, for example:
*Rose Figliuolo*—COPD [chronic obstructive pulmonary disease], CVA [typed: with hemiparesis of lower extremities]
*Charles Griffin*—Advanced Parkinsons Disease
*Lawrence E. McCall*—Old CVA, DJD [with Apraxia, lower extremities, paralysis]
*Zell E. Berry*—(illegible) ... CVA June, 1983 [paralysis of right knee and hip]
*Michael A. DeLaura*—Diabetes [amputee—perifial [sic] vascular disease/severe osteoarthritis of hips w/hip involvement]

69. Approximately twenty CMN's contained only typed material with no handwritten diagnoses.

70. Some of the CMN's which contained typing on the diagnosis did not indicate that the arthritis was severe.

71. The Plaintiff called both Defendants to testify as upon cross-examination. Both Defendants invoked their Fifth Amendment privilege and refused to answer any of the questions asked by the Plaintiff's counsel, including questions regarding Defendants' role in causing the typing to be added to the disputed physicians' certificates; whether Defendants had contacted any doctors regarding their diagnosis; and whether the Defendants "knew [they] were submitting false claims for payment to Blue Shield."

72. The parties stipulated that the average reimbursement for each of the contested claims was $1,140.00.

73. The Defendants did not list the Plaintiff as a creditor on their Chapter 7 schedules.

74. The Plaintiff did not filed a Proof of Claim in either of the Defendants' bankruptcy cases.

CONCLUSIONS OF LAW

1. A bankruptcy court may determine dischargeability of a claim which is not liquidated but will generally not make the determinations necessary to liquidate the claim itself, since the dischargeability plaintiff is expressing a desire not to make a claim against the Debtor's estate.

2. The Plaintiff failed to establish all of the prerequisites necessary to successfully maintain an action under § 523(a)(2)(A). In particular, it failed to establish, by the requisite clear and convincing evidence standard, that the typed additions to the CMN's were false or that they were made by the Defendants with the purpose and intent of deceiving the Medicare Program.

3. Absent convincing independent evidence of these necessary elements of a cause under 11 U.S.C. § 523(a)(2)(A), the court will not impute these elements from the Defendants' invocation of their Fifth Amendment privilege to not testify.

4. The Defendants' debts to the Plaintiff were not established to be non-dischargeable under 11 U.S.C. § 523(a)(6) because of the Plaintiff's failure to prove that the Defendants intended to effect a willful and malicious conversion upon the Plaintiff.

5. The penalty provisions of the federal False Claims Act are not within the scope of 11 U.S.C. § 523(a)(7). Rather, a claim under the False Claims Act is non-dischargeable only under § 523(a)(2)(A) or § 523(a)(6), where the requirements of those Code sections have been met.

6. The Plaintiff has not proven that the debts in issue are dischargeable under 11 U.S.C. §§ 523(a)(2)(A), (a)(6), or (a)(7), and therefore the Defendants are entitled to judgment in their favor.

*DISCUSSION*

### I. A BANKRUPTCY COURT SHOULD RESOLVE A DISCHARGEABILITY COMPLAINT WHETHER THE UNDERLYING DEBT IS LIQUIDATED OR NOT, BUT IT SHOULD DECLINE TO ENTER A LIQUIDATED JUDGMENT ON A DISCHARGEABILITY COMPLAINT IN A CHAPTER 7 PROCEEDING

The parties apparently take radically different points of view on the role of the bankruptcy court when the issue of dischargeability is raised in reference to a debt which has not been liquidated pre-petition. In discussing the Plaintiff's § 523(a)(7) claim, Defendants argue that no such claim can be raised because there has been no imposition of any fine or penalty upon the Defendants prior to the institution or even the trial of this proceeding.

We disagree with the assertion that liquidation of a debt has any bearing on whether it is dischargeable or not. The role of the bankruptcy court is not to determine the extent of non-dischargeable debts, as we indicate below, but to determine whether debts are dischargeable. A contrary rule would support the monstrous result of protecting a debtor who does an act which would otherwise result in a non-dischargeable debt, but files a Chapter 7 case before the claimant can bring it to judgment, and is therefore rewarded with a Chapter 7 discharge of the debt. Therefore, we do not think that whether the Defendants here have been found liable for a penalty or a fine is at all decisive in determining the dischargeability of their alleged obligation to the Plaintiff under § 523(a)(7). Similarly, the fact that no judgment has been entered against the Defendants, either civilly or criminally, should have any impact on the Plaintiff's assertion that its debts are non-dischargeable under § 523(a)(2)(A) or § 523(a)(6).

On the other hand, the Plaintiff, citing only 28 U.S.C. § 157(b) as support therefor,[1] urges this Court to proceed to liquidate the Defendants' liability in this Court, and further enter judgments in the amount of such liability. However, the Plaintiff has cited no case in which the damages or penalties which a claimant seek to declare non-dischargeable were imposed by the bankruptcy court, as opposed to another state or federal court or administrative agency. We reject the Plaintiff's position, especially in a Chapter 7 liquidation where the alleged creditor has not even filed a Proof of Claim and is therefore obviously not seeking to share in the distribution of the bankruptcy estate.

We acknowledge that Section 17c(3) of the predecessor Bankruptcy Act provided that "if any debt is determined to be non-dischargeable, [the court] shall determine the remaining issues, render judgment, and make all orders necessary for the enforcement thereof." However, without any apparent explanation in the legislative history, this provision was omitted from § 523 of the Bankruptcy Code. We are most reluctant to read such an omitted provision back into the Code.

Contrary to the position of the Plaintiff is the observation that a creditor pursuing a nondischargeability complaint is expressing a desire to pursue the debtor over and above what he could obtain from the debtor's estate in bankruptcy. Hence, the amount which the creditor is owed in a nondischargeable debt has no relevance to the debtor's estate in bankruptcy. It is therefore questionable whether such a claim is any way related to the debtor's bankruptcy proceeding.

---

**1.** The only possibly pertinent provisions of 28 U.S.C. § 157(b) would appear to be § 157(b)(2)(B), which relates to allowance or disallowance of claims, or § 157(b)(2)(I), which relates to determinations of dischargeability. However, the reference in § 157(b)(2)(B) is to claims "against the estate," which we do not believe includes claims which are alleged to be nondischargeable. The reference in § 157(b)(2)(I) is to only "determinations" of dischargeability, not determination of the amount of the nondischargeable debt.

If the creditor wishes to make a claim against the debtor in a bankruptcy, his sole recourse is, generally, to the claims process. *See In re New York City Shoes, Inc., Richard Royce Collections, Ltd. v. New York City Shoes, Inc.*, 84 B.R. 947, 959–60 (Bankr.E.D.Pa.1988); and *In re International Endoscope Manufacturers, Inc.*, 79 B.R. 620, 621 (Bankr.E.D.Pa.1987). The bankruptcy court will, under § 157(b)(2)(B), determine the validity of contested claims against the estate. However, frequently, the absence of assets renders the determination of the validity of claims unnecessary. There is no logical reason why a bankruptcy court should extend its scarce resources to determine such unnecessary issues.

■ We note that, here, the Plaintiff has failed to so much as file a proof of claim in either of the Defendants' Chapter 7 cases. A proof of claim would have been filed if the Plaintiff desired to share in the distribution of the assets of the Defendants' respective bankruptcy estates. *See* 11 U.S. C. § 501; Bankr. Rule 3002(c); H.R.REP. NO. 95–595, 95th Cong., 1st Sess. 352 (1977); and S.REP. NO. 95–989, 95th Cong., 2nd Sess. 61 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787. By failing to file any proofs of claim, and pursuing these proceedings instead, the Plaintiff has expressed an option to seek to obtain payment from the Defendants after discharge in a non-bankruptcy forum rather than to collect anything from their estates in this forum. One of the primary concerns of this bankruptcy court is the expeditious administration and disposition of claims against debtors' estates. In a Chapter 7 case, this means the expeditious liquidation and distribution of the estate to creditors. We question the advisability of utilizing this court's scarce resources to fix liabilities that will not impact at all upon the Defendants' bankruptcy estate. We also note that the issues to be determined in a dischargeability proceeding will usually differ and are often less complex than those that will need to be decided in determining the underlying liability and assessing damages, often by a jury. No right to a jury trial exists in a dischargeability action.

*See, e.g., In re Merrill*, 594 F.2d 1064 (5th Cir.1979); *In re Swope*, 466 F.2d 936 (7th Cir.1972); and *In re Bailey*, 75 B.R. 314, 316 (M.D.Tenn.1987).

The Plaintiff's contention that we should determine the amount of an allegedly dischargeable debt is particularly troubling in the context of its claims under § 523(a)(7). The Plaintiff asks this court to assess a civil penalty or fine in this case and then to find that such a penalty or fine is not dischargeable because it has been imposed within the meaning of § 523(a)(7). However, the Plaintiff fails to cite any case where the bankruptcy court imposed the penalty that was found to be non-dischargeable under § 523(a)(7). This is not surprising, because penalties and fines generally arise in criminal proceedings, which a bankruptcy court cannot hear. This is not to say that we could not determine whether a debt is nondischargeable under § 523(a)(7) prior to litigation in another tribunal, under the reasoning we applied in rejecting the Defendants' argument that the allegedly nondischargeable debt must be liquidated prior to the trial of the dischargeability proceeding. However, it means that we will let the determination of penalties and fines to other courts better equipped to deal with such matters. Rights to a jury trial are particularly likely to arise in criminal or quasi-criminal proceedings wherein penalties and fines may be imposed.

## II. THE PLAINTIFF HAS FAILED TO ESTABLISH A CLAIM UNDER § 523(a)(2)(A) BY THE REQUISITE CLEAR AND CONVINCING EVIDENCE.

■ We begin this discussion by noting that exceptions to discharge will be strictly construed against the objecting creditor and in favor of the debtor in light of the strong policy of the Bankruptcy Code to provide the debtor a financial "fresh start." *In re Fitzgerald*, 73 B.R. 923, 926 (Bankr. E.D.Pa.1987); *In re Woods*, 66 B.R. 984, 988 (Bankr. E.D.Pa.1986); and 3 COLLIER, *supra*, ¶ 523.05A, at 523–16.

The pertinent Code Section, 11 U.S.C. § 523(a)(2)(A) provides that a discharge of a debtor pursuant to Chapter 7 will not discharge any debt for money obtained by

> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition ...

The general purpose of this provision is to prevent a debtor from retaining property acquired by fraud. 3 COLLIER, *supra*, ¶ 523.08[1], at 523–39.

■ The Plaintiff concedes that, in order to prevail on the basis of an objection to dischargeability under § 523(a)(2)(A), it must establish all of the following elements by the demanding standard of "clear and convincing evidence:"

(1) that the debtor made the representation;

(2) that at the time he knew they were false;

(3) that he made them with the intention and purpose of deceiving the creditor;

(4) that the creditor relief on such representations; and

(5) that the creditor sustained the alleged loss and damages as a proximate result of the representations having been made.

*Fitzgerald, supra,* 73 B.R. at 926; *Woods, supra,* 66 B.R. at 988; *In re Gelfand,* 47 B.R. 876, 879 (Bankr. E.D.Pa.1985); and *In re Colasante,* 12 B.R. 635, 639 (Bankr. E.D.Pa.1981). Fraud under § 523(a)(2)(A) thus includes only those acts proven to involve moral turpitude or intentional wrong and does not apply to fraud implied in law which may occur in the absence of bad faith or immorality. *In re Black,* 787 F.2d 503, 505 (10th Cir.1986); *In re Butler, Howkins v. Butler,* 86 B.R. 829, 831–832 (Bankr. E.D.Pa.1988); and 3 COLLIER, *supra,* 523.08[5], at 523–50.

It would be helpful at the outset to indicate several issues that are not relevant to a determination of the dischargeability under § 523(a)(2)(A) in the present matter. It is not relevant that isolated beneficiaries who received Medicare reimbursement for seat-lift chairs may have been able, on occasion, to set and stand without such a chair, contrary to what Taylor's testimony seemed to imply. It is not relevant that certain physicians may have improvidently prescribed a seat-lift chair as a "favor" to their respective patients. The Defendants cannot be held responsible for any misrepresentations or errors in evaluations of particular beneficiaries' need for seat-lift chairs made by the beneficiaries or their physicians absent some showing of a conspiracy or agreement between the Defendants and the physician. No such showing was made in this case.

■ In addition, this case does not turn on whether any individual claim or group of claims was properly processed or paid. Failure to follow proper procedures absent proof of fraud will not preclude a discharge under § 523(a)(2)(A). The Plaintiff may not use the present proceeding to recoup improperly paid claims unless payment was obtained through use of some fraud or misrepresentation. *Cf. Fitzgerald, supra,* 73 B.R. at 923 (Social Security Administration's determination that recipient was overpaid benefits does not establish elements of § 523(a)(2)(A)).[2]

We believe that the Plaintiff has established that the Defendants made the representations at issue in this proceeding. While the typed additions to the CMN's diagnoses were actually made by the typists at E & S, these additions appear to have been made at the direction of the Defendants or Cohen. At a minimum, this typing was added with the knowledge and consent of the Defendants. Cohen testified that the Defendants themselves contacted some of the physicians regarding the "corrections" to be added to the diagnoses before they were added. This conclusion is further supported by consideration of the positions held by the Defendants in E & S

---

**2.** We note that Tress's testimony indicated that many of the claims submitted would not have been approved without consideration of the typed "corrections." His report, however, does not establish the existence of fraud in the submission or payment of these claims.

plus the fact that the Defendants themselves had signed a majority of the claim forms prior to submitting same to Blue Shield.

The Plaintiff has also established that the representations were material. Defendants suggest that there were no material misrepresentations made, since, with respect to each of the contested claims, the physician had prescribed a seat-lift chair and had certified by way of the CMN that such a chair was medically necessary for their patient.[3]

In fact, with respect to each of the disputed claims, the signatory physician did prescribe the chair and did certify that same was necessary for his or her patient. This conclusion is supported by the testimony of Taylor as well as from the CMN's themselves. Taylor testified that each of the physicians that he interviewed indicated that he or she had prescribed the seat-lift chair, although apparently a few indicated that they may have done so improvidently. There has been no suggestion or evidence indicating that the physicians' signatures on the CMN's were forgeries. Thus, it appears clear that, in the medical opinion of the signatory physicians, they each felt that his or her respective patients who obtained seat-lift chairs from E & S needed such devices as a result of his or her physical impairments.

However, more detailed eligibility guidelines for Medicare reimbursement are set forth in the Medicare Appendix. In addition, the Blue Shield claims processors used the Logic Table in determining initially if a claim should be approved, denied, or referred to a physician for further evaluation before approving or denying it. Both the Medicare Appendix and the Logic Table set forth eligibility criteria that was dependent upon the diagnosis of the the beneficiary's condition. As a result, any representation regarding the diagnosis of the beneficiary's impairments would be a material representation.

In addition, Plaintiff has established that Blue Shield relied upon the representations contained in the CMN's. The uncontroverted testimony of the Blue Shield representatives was that the claims processors considered both the handwritten and the typed language on the CMN's when determining whether to approve or deny claims.

Assuming that the Plaintiff had established the remaining elements of fraud under § 523(a)(2)(A), we believe that they have established that any damages sustained were the proximate result of the typed additions to the CMN's. Tress testified that, from his review of the claim forms, 849 claims would have been denied without consideration of the typed additions.[4] Tress' testimony, together with a review of the claims admitted into evidence and the Logic Table establish that many of the disputed claims would not have been paid without the typed additions. It has been stipulated that the government paid $1,140.00 for each disputed claim.

█ However, we find the Plaintiff's proof lacking with respect to the falsity of the typed additions and whether the representations contained in such additions were made by the Defendants with the purpose and intent of deceiving the Plaintiff.

The Plaintiff produced no direct evidence to establish that any of the typed additions to any of the CMN were in fact false.[5] It

---

3. In fact, the Medicare statute requires only that a physician certify that "in the case of medical and other health services [including durable medical equipment] ... such services are and were medically required." 42 U.S.C. §§ 1395m(a)(2)(B), 1395x(s)(6).

4. While we concur with Tress's testimony that many of the 849 claims would not have been paid, we question his conclusion that all of these claims would have been denied for a number of reasons. Many of the claims submitted did appear to match the eligibility criteria contained in the Logic Table. See pages 842–43

supra. In addition, it does not appear that Tress gave consideration to the beneficiary's prognosis in evaluating the severity of the beneficiary's impairment. See page 842 supra. In sum, it appeared that Tress was overly stringent in applying the eligibility criteria contained in the Logic Table, in all likelihood much more stringent than the claims processors themselves would have been.

5. Tress's testimony goes only to the issue of whether the claims would have been paid initially without consideration of the typed "corrections." His report did not address the issues

called no beneficiary to testify that he or she did not have the diagnosis typed in on the CMN's. It called no physician to testify that his or her patient in fact did not suffer from severe arthritis of the knees or hips as was commonly indicated on the revised CMN's. Rather, it asks the court to infer that the typed additions are in fact false based upon purely circumstantial evidence. Thus, the Plaintiff apparently seeks such an inference based upon E & S's frequent use of standardized language on the CMN's together with the fact that the typed additions were not accompanied by the signatory physician's initials. The Plaintiff also suggests that Cohen's testimony that E & S contacted physicians for approval before the additions were typed was incredible in light of the number of claims that E & S processed.

The fact that E & S frequently used standardized language on the CMN's does not alone establish that the statements were in fact false, i.e., that the beneficiary did not suffer from some form of severe arthritis of the knees or hips. Even if the court were to assume the falsity of such statements, we cannot infer that such standardized language was being utilized with the intent and purpose of deceiving Medicare. The results of Taylor's survey, i.e., that the signatory physicians confirmed the "corrected" diagnoses, precludes such an inference.

It is clear that Cohen had concluded that a claim form must contain certain "magic language," i.e., "severe arthritis of the hip and/or knee with hip and/or knee involvement" or some variant thereof. However, it appears that Cohen was given this impression by Blue Shield. Indeed, this appeared to be the position of the witnesses from Blue Shield. Thus, Tress indicated in his report that claims involving generalized or degenerative arthritis should be denied where such claim failed to use the word "severe." See claim of Ellen Franklin, page 842 *supra*. Rule 1 of the Logic Table provides for approval of claims involving arthritis of the knee where the arthritis is described as crippling, degenerative, or generalized. In addition, Tress's report indicates that claims should be denied absent the magic "severe" language on the diagnosis line despite the fact that the signatory physician indicated a prognosis of guarded or poor. See claim of Jean Amendolari, page 842 *supra*.

The Defendants' position is further supported by Cohen's testimony regarding use of the "99 month" stamp. Shaffer advised Cohen to obtain a stamp to indicate that each seat-lift chair would be needed for 99 months so that E & S could be paid for each seat-lift chair in one lump sum. Such a stamp appears on a number of the claim forms admitted into evidence. The stamp was not accompanied by any doctor's initials. However, it is clear that such standardized language was utilized to comply with the expressed requirements of Blue Shield in one context, making it logical that it could be employed properly in another. We believe that use of standardized language on the "corrected" CMN's was motivated by a desire to comply with what was perceived to be the technical requirements of Blue Shield rather than a desire to circumvent those requirements.

The Plaintiff also relies upon the fact that the additions made were not accompanied by an indication that the change was made per telephone instructions and the physician's initials. According to Blue Shield's witnesses, it apparently was permissible to make corrections to the diagnosis on the CMN so long as these corrections were accompanied by the appropriate notation and the physician's initials. However, we credit Cohen's testimony that she was not advised of this alleged policy. It seems unlikely that Blue Shield would require a notation that a change was made via telephone instructions if the form then had to be returned to the physician for his signature. Moreover, this alleged "policy" does not appear to be contained in any manual or correspondence to E & S. Even if Shaffer had given these directions to Cohen, we

of either the falsity of the typed additions or whether the claims were properly paid, considering the additional typed information.

believe that Cohen misunderstood these directions rather than intentionally attempting to circumvent them. Such a misunderstanding is insufficient to establish fraudulent intent under § 523(a)(2)(A).

The Plaintiff argues that Cohen's testimony was incredible because she could not have possibly had time to contact all of the signatory physicians on the disputed CMN's. In so arguing, the Plaintiff relies primarily on the testimony of Tuner that the typists processed 100 to 125 claims per day. However, for the reasons set forth at pages 841–42 *supra,* we believe that Tuner's estimate was exaggerated. The Plaintiff admitted 789 contested claim forms into the record in the present matter. The Stipulation of Settlement in Adv. No. 87–0197S states that E & S had approximately 3,300 claims pending with Blue Shield. There has been no evidence presented to indicate how many of these pending claims contained typing. Cohen testified that the Defendants also contacted the physicians and that they were contacted only when there was a question regarding a CMN, which was not in every case. Assuming that Cohen or one of the Defendants contacted the physicians for each of the disputed paid and unpaid claims (789 + 3,300 = 4,089) during the approximately 19 months that E & S was actively in business, each principal would have placed between three to four calls a day. In light of this, we do not find Cohen's testimony to be incredible.

In addition, the Plaintiff has failed to present clear and convincing evidence that the Defendants made any alleged misrepresentations on the CMN's with the purpose and intent of deceiving the Medicare program. Cf. *In re Woerner,* 66 B.R. 964, 976 (Bankr.E.D.Pa.1986), *aff'd,* C.A. No. 86–7324 (E.D.Pa. April 27, 1987) (plaintiff law firm failed to produce evidence that debtor did not intend to pay for legal services rendered). We recognize that it may be difficult to present direct evidence of such fraudulent intent. Thus, the court may infer such fraudulent intent from the circumstances of a case. Nevertheless, the evidence presented must be convincing and the inference compelling. We decline to infer such fraudulent intent given the evidence presented in the present case.

■ We agree that the evidence presented by the Plaintiff indicates the existence of suspicious circumstances and raises some serious questions about whether E & S was following the proper procedures in processing their Medicare claims. However, in a dischargeability complaint under § 523(a)(2)(A), the plaintiff may not rest on suspicious circumstances alone. Cf. *Matter of Haas,* 29 B.R. 566 (Bankr.M.D.Fla. 1983) (showing of conduct which creates suspicion of fraud insufficient to render debt nondischargeable); and *Matter of Peterson,* 2 B.R. 402 (S.D.Ga.1980) (insufficient or nonexistent evidence does not sustain burden of proof in nondischargeability action). The evidence presented here raises more questions than it answers. We therefore conclude that, on the basis of the record presented here, the Plaintiff has failed to sustain its burden of presenting clear and convincing evidence of fraud.

■ Absent convincing independent evidence of fraud pursuant to 11 U.S.C. § 523(a)(2)(A), the court will not infer such fraud due to the Defendants' invocation of their Fifth Amendment privilege not to testify. We recognize that, in evaluating the facts in this case, we must consider negative inferences which may be drawn from the Defendants' invocation of the Fifth Amendment. In the criminal context, the Fifth Amendment "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *Griffins v. California,* 380 U.S. 609, 615, 85 S.Ct. 1229, 1233, 14 L.Ed.2d 106 (1965). This privilege against self-incrimination applies to civil proceedings also, where the answers might tend to incriminate the witness in future criminal proceedings. *Lefkowitz v. Turley,* 414 U.S. 70, 77, 94 S.Ct. 316, 322, 38 L.Ed.2d 274 (1973). In addition, a state may not coerce a witness to relinquish the Fifth Amendment privilege or penalize the exercise of that privilege. *See Lefkowitz v. Cunningham,* 431 U.S. 801, 806, 97 S.Ct. 2132, 2136, 53 L.Ed.2d 1

(1977) (court invalidated state statute which divested attorney of his political party office due to his refusal to waive his immunity before grand jury); *Turley, supra* (state may not cancel contracts with architects due to invocation of Fifth Amendment); and *Gadner v. Broderick*, 392 U.S. 273, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968) (police officer could not be discharged for refusal to answer grand jury questions on Fifth Amendment grounds). Furthermore, in assessing the coercive effect of such governmental action, the Court will take into account the probable economic impact of such action. *Cunningham, supra,* 431 U.S. at 806, 97 S.Ct. at 2136.

■ The Fifth Amendment, however, does not forbid drawing adverse inferences against parties in civil actions where they refuse to testify in response to probative evidence being offered against them. *Baxter v. Palmigiano,* 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976); *RAD Services, Inc. v. Aetna Casualty & Surety Co.,* 808 F.2d 271 (3d Cir.1986). In *Baxter, supra,* the Supreme Court cites to 8 J. WIGMORE, WIGMORE ON EVIDENCE, ¶ 2272, at 439–42 (McNaughton rev. 1961), which states as follows:

> The opinions in the cases on this point, as can be inferred from the illustrated citations below, are confused.... The inference seems to be allowed with least reluctance in cases where the party claiming privilege has an affirmative burden in the cause, where he has exclusive access to information which would, if favorable to him, dispute evidence adverse to him already before the tribunal, or where the inference is used only to buttress other evidence.

However, it is clear that "there must be sufficient independent evidence—besides the mere invocation of the privilege—upon which to base the negative inference." *United States v. Local 560 of International Brotherhood of Teamsters, Etc.,* 780 F.2d 267, 292 n. 32 (3d Cir.1985), *cert. denied,* 476 U.S. 1140, 106 S.Ct. 2247, 90 L.Ed.2d 693 (1987). *See also National Acceptance Co. of America v. Bathalther,* 705 F.2d 924, 929 (7th Cir.1983). The Bankruptcy Court for the Eastern District of Virginia has recently held that the court may not draw adverse inferences from an alleged debtor's invocation of the Fifth Amendment privilege to "fill in the gaps of the movant's case" on a motion for summary judgment and that such an inference "would abrogate a fundamental constitution right." *In re Caucus Distributors, Inc.,* 83 B.R. 921, 926 (Bankr.E.D.Va.1988).

In order to prevail in its dischargeability complaint on the basis of § 523(a)(2)(A), the plaintiff must present clear and convincing evidence of the Defendants' fraud. The Plaintiff has failed to present such convincing evidence with respect to the falsity of the statements made and the intent to defraud. We decline to draw the adverse inferences from the Defendants' invocation of their Fifth Amendment rights to fill in the gaps in its case, as urged by the Plaintiff.

Absent substantial and compelling independent evidence of the required elements of fraud under § 523(a)(2)(A), it would be inappropriate to allow a plaintiff to establish such fraud simply by the fact that a defendant invoked the Fifth Amendment. If the court adopted such reasoning, we would be endangering the right of a debtor who invoked his or her Fifth Amendment privilege to a discharge in bankruptcy. We believe such a position would be both unwise and would unduly penalize a debtor for invocation of the Fifth Amendment privilege.

■ It must be borne in mind that a witness "may have a reasonable fear of prosecution and yet be innocent of any wrongdoing." *Slochower v. Board of Higher Education,* 350 U.S. 551, 557–58, 76 S.Ct. 637, 641, 100 L.Ed. 692 (1956). The privilege may be invoked whenever it is not possible to determine, from the question alone, that an answer would not incriminate or even furnish a "link in the chain of evidence needed to prosecute the claimant for a federal crime." *Hoffman v. United States,* 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951). As a result, it is difficult to draw any meaningful inference from invocation of the privilege.

*Lionti v. Lloyds Ins. Co.,* 709 F.2d 237, 245 (3d Cir.1983) (Stern, dis. op.). Moreover, if the Plaintiff wished the Defendants to answer its questions, it could have requested a grant of use immunity pursuant to 11 U.S.C. § 344.

Absent convincing independent evidence of fraud under § 523(a)(2)(A), we will decline to infer same simply from the Defendants' invocation of the Fifth Amendment.

## III. THE PLAINTIFF HAS NOT ESTABLISHED A WILLFUL OR MALICIOUS INJURY UNDER § 523(a)(6).

 Plaintiff also argues that the Defendants' alleged indebtedness to it is non-dischargeable under § 523(a)(6) as a debt for "willful and malicious injury by the debtor to another entity." This exception to discharge includes "willful and malicious" conversion. *In re Lane,* 76 B.R. 1016, 1023 (Bankr.E.D.Pa.1987). However, a debt based on a "technical" conversion which is due to a mistake or misunderstanding is dischargeable. 3 COLLIER, *supra,* ¶ 523.16[3], at 523–119, citing *Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934). Thus, a willful and malicious injury under § 523(a)(6) requires proof of intent to cause an injury. *Lane, supra,* 76 B.R. at 1023; and *In re Gaebler,* 83 B.R. 264, 267 (Bankr. E.D.Pa.1988).

 The Plaintiff has failed to produce any direct evidence of the Defendants' intent to effect a willful or malicious conversion upon the Plaintiff, and, for the reasons previously discussed at pages 845–851 *supra,* we do not believe that the circumstances presented in the instant case are sufficiently compelling to infer such an intent absent direct proof.

## IV. THE DEFENDANTS' ALLEGED DEBT IS NOT NON–DISCHARGEABLE UNDER THE PROVISIONS OF 11 U.S.C. § 523(a)(7)

The Plaintiff, as we indicated at the outset, also maintains that the Defendants presented false and fraudulent claims for payment in violation of the federal False Claims Act, 31 U.S.C. § 3729, et seq., enti-

tling it to statutory damages under that Act. The False Claims Act authorizes imposition of "a civil penalty of not less than $5,000.00 and not more than $10,000.00, plus three times the amount of damages which the Government sustains" as a result of any violation of the Act. 31 U.S.C. § 3729(a). The Plaintiff maintains that such statutory penalties, as yet unassessed, should be assessed by us and then found nondischargeable by us as well. The Plaintiff's position in this matter presents us with the apparently novel issue of whether the bankruptcy court should assess penalties under the False Claims Act which would then, arguably, be non-dischargeable under the provisions of 11 U.S.C. § 523(a)(7).

This section of the Bankruptcy Code provides that no debt may be discharged in a Chapter 7 bankruptcy

> to the extent such debt is for fine, penalty, or forfeiture payable to and for the benefit of a governmental unit, and is not compensation for actual pecuniary loss, other than a tax penalty.

Under the predecessor Bankruptcy Act, penalties payable to governmental units due to illegal activities were not discharged in bankruptcy since they were not "provable" under the Act. *United States v. Re-Pass,* 688 F.2d 154 (2d Cir.1982); *In re DiVincenzo,* 1 B.R. 528 (Bankr.S.D.N.Y. 1979). Thus, the Act contained no specific provision relating to the dischargeability of such penalties. 3 COLLIER, *supra,* ¶ 523.17, at 523–124. As the Plaintiff points out, the concept of "provability" was eliminated under the current Bankruptcy Code. Section 523(a)(7) of the Code specifically excepts from discharge certain fines, forfeitures and penalties payable to a governmental unit. *See Kelly v. Robinson,* 479 U.S. 36, 107 S.Ct. 353, 361–63, 93 L.Ed. 2d 216 (1986).

 Whether a penalty payable to the government is exempt from discharge turns on whether the penalty is imposed for compensatory reasons or to punish the wrongdoer. Only if the penalty is imposed for punishment of the wrongdoer is the debt arising from the penalty nondis-

chargeable under § 523(a)(7). *See In re Corbly,* 61 B.R. 851 (Bankr.D.S.D.1986) (civil contempt judgment dischargeable to extent imposed to compensate rather than to uphold the dignity of the court); and *In re Tauscher,* 7 B.R. 918 (Bankr.E.D.Wis. 1981) (civil penalty for child labor violations of Fair Labor Standards Act not dischargeable where legislative history reveals penalties not compensation for actual loss). Thus it has been held that parking fines are dischargeable to the extent that they relate to a pecuniary loss, i.e., compensation for monetary injury actually incurred. *In re Caggiano,* 34 B.R. 449, 450 (Bankr.D. Mass.1983). As stated by the court in *In re Hite,* 53 B.R. 21, 23 (Bankr.M.D.Tenn. 1985):

> To make a determination under this section [523(a)(7)], the court must determine whether an assessment is penal or pecuniary in nature.... Courts analyzing this section have focused on the congressional intent of the statute authorizing the assessment and the economic impact on the parties.

*Cf. In re Carracino,* 53 B.R. 513 (Bankr.D. N.J.1985) (fines imposed for water pollution not dischargeable under § 523(a)(7), though debt owed to reimburse state for cleaning up river was dischargeable); *In re Daugherty,* 25 B.R. 158 (Bankr.E.D.Tenn.1982) (civil penalty for violation of state mining act not dischargeable under § 523(a)(7) where it was not compensatory for any actual pecuniary loss).

■ The objective of the False Claims Act is to "broadly protect the funds and property of the Government from fraudulent claims." *Rainwater v. United States,* 356 U.S. 590, 592, 78 S.Ct. 946, 948, 2 L.Ed.2d 996 (1968). The Act, being remedial in nature, should not be narrowly construed. *United States v. Neifert–White Co.,* 390 U.S. 228, 232–33, 88 S.Ct. 959, 961–62, 19 L.Ed.2d 1061 (1968); and *Re-Pass, supra,* 688 F.2d at 157. The Supreme Court, in *United States v. Bornstein,* 423 U.S. 303, 314, 96 S.Ct. 523, 530, 46 L.Ed.2d 514 (1976), notes that

> past decisions of this Court have reflected a clear understanding that Congress intended the double-damages provision to play an important role in compensating the United States in cases where it has been defrauded. "We think the chief purpose of the [Act's civil penalties] was to provide for restitution to the government of money taken from it by fraud, and that the device of double damages plus a specific sum was chosen to make sure that the government would be made completely whole." *United States ex rel. Marcus v. Hess,* 317 U.S., [537] at 551–552, 63 S.Ct. [379] at 387–388, 87 L.Ed. at 443 [(1943)]. For several different reasons, this make-whole purpose of the Act is best served by doubling the Government's damages before any compensatory payments are deducted.

■ The civil remedies provided by the Act do not lose their remedial quality simply because they provide compensation for more than the precise amount of actual damages. *Marcus, supra,* 317 U.S. at 549, 63 S.Ct. at 386–87. Earlier decisions construed the Act as penal in nature, requiring a specific intent to defraud the government to establish a violation. *United States ex rel. Hughes v. Cook,* 498 F.Supp. 784, 787 (S.D.Miss.1980) (requiring showing of personal knowledge of and personal participation in an attempt to cheat the government). See Note, *The False Claims Act and the Proposed Program Fraud Civil Remedies Act,* 73 KY. L.J. 967 (1984–85) (criticizes earlier decisions that construed the Act as penal as "now conflict[ing] with more modern needs for a remedial civil statute"). Moreover, the legislative history for False Claims Amendment Act enacted in 1986 states that

> [a]s a civil remedy designed to make the Government whole for fraud losses, the civil False Claims Act currently provides that the Government need only prove that the defendant knowingly submitted a false claim. However, this standard has been construed by some courts to require that the Government prove the defendant had actual knowledge of fraud, and even to establish that the defendant had specific intent to submit the false claim, for example, *United States v. Aerodex, Inc.,* 469 F.2d 1003

(5th Cir.1972). The Committee believes this standard is inappropriate in a civil remedy and presently prohibits the filing of many civil actions to recover taxpayer funds lost to fraud.

The Committee's interest is not only to adopt a more uniform standard, but a more appropriate standard for remedial actions. S.REP. No. 99–345, 1986 U.S. CODE CONG. & ADMIN. NEWS (99 Cong.) 5266, 5271–5272.[6] Thus, the better view is that the Act is remedial and compensatory in purpose, rather than penal. *Cf. In re Well-ham*, 53 B.R. 195, 198 (Bankr.M.D.Tenn. 1985) (action for damages under the False Claims Act is not exempt from the automatic stay by 11 U.S.C. § 362(b)(4) applicable to actions to enforce a governmental unit's police or regulatory power since such an action is merely an action for damages).

In light of the compensatory nature of the False Claim Act, we believe that the civil remedies provided by the Act do not constitute a "fine, penalty, or forfeiture" under 11 U.S.C. § 523(a)(7). This conclusion is supported by the fact that the False Claim Act has criminal counterparts. 18 U.S.C. § 287 (false claims); and 18 U.S.C. § 1001 (false statements.)[7] Both of these criminal provisions provide for imposition of fines as well as incarceration.

Of course, any claims based on civil penalties imposed under the False Claims Act may, in certain instances, be excepted from discharge under the provisions of 11 U.S.C. § 523(a)(2)(A) (fraud) or § 523(a)(6) (willful injury to property). However, for the reasons discussed above at pages 845–51 *supra*, we find that the Plaintiff has failed, in the present case, to establish the requisite intent for either of these exceptions to discharge to apply here. We believe that this is the preferable view, and avoids the possibly anamolous result of allowing discharge of the underlying debt under § 523(a)(2)(A), but denying discharge of the trebling of such a debt under § 523(a)(7).

CONCLUSION

For the foregoing reasons we find that the Plaintiff has failed to establish cause for declaring its claims against the Defendants nondischargeable under either §§ 523(a)(2), 523(a)(6), or 523(a)(7). An appropriate Order will be entered.

---

**6.** The False Claims Amendment Act specifically provides that no proof of specific intent to defraud is required to establish a violation of the Act. 31 U.S.C. § 3729(b).

**7.** The original False Claims Act contained three sections—two imposing criminal liability and the other providing for statutory penalties. Act of Mar. 2, 1863, ch. 67, 12 Stat. 696–699, repealed by Act of Mar. 4, 1909, ch. 321, § 341, 35 Stat. 1153. The criminal provisions were repealed and reenacted as part of the Criminal Code.